THE COMMERCIAL BANK OF ALBANY, Appellant, v. VISSCHER TEN EYCK, Respondent.

The cashier of a bank is bound to exercise reasonable skill and ordinary care and diligence in the performance of his duties. If he fails in such skill or omits such care and diligence, and the bank suffers damage in consequence, he is liable.

In the absence of fraud or collusion, he is not liable to the bank for an act done under the direction of its president, the managing officer, under circumstances which do not disclose any absence of due care and diligence upon his part.

The provisions of section 8, of the act in relation to moneyed corporations (1 R. S., p. 591), which provide that no conveyance, etc., of the real estate and effects of such corporation, exceeding $1,000 in value, shall be made, unauthorized by a previous resolution of the board of directors, do not apply to a sale, by the financial officers of a bank, of mortgages or other securities pledged to secure a loan, made to realize the money secured by the pledge.

Where the transaction is in reality a loan upon sufficient security, if loss is sustained, a cashier is not liable for permitting it to be done in the form of an overdraft.

A cashier forwarded certain securities, belonging to his bank, to responsible brokers for sale, drawing against them for a portion of their value, which draft was accepted and paid. He negligently omitted to inquire after the securities or to collect the balance realized on sale thereof. The brokers, with knowledge that the bank had an interest therein, wrongfully applied such balance upon a claim against a third person. In an action against the cashier (the brokers remaining responsible), held that, as the brokers

were liable to the bank for the balance, it sustained no damage from the cashier's negligence, and he, therefore, was not liable.

(Argued September 27, 1871; decided January term, 1872.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial district, affirming a judgment entered upon the report of a referee in favor of the defendant. (Reported below, 50 Barb., 9.)

The action was brought to recover of the defendant damages alleged to have been sustained by the plaintiff, by reason of the neglect or misconduct of the defendant as cashier of the plaintiff's bank. The facts pertinent to the questions discussed appear in the opinion.

The referee decided that plaintiff was not entitled to recover, and directed judgment for defendant, which was entered accordingly.

*John H. Reynolds* for the appellant. It is a violation of duty for a cashier to allow an overdraft, and if a loss is sustained by reason thereof he is liable. (*Bank of St. Mary* v. *Calder,* 3 Strobhart, *S. C.,* 403 ; *Miner* v. *Bank of Alex.,* 1 Peters, 46, 70.) The bank having a technical right of action therefor, it could only be disharged by payment or release under seal. (*McKnight* v. *Dunlop,* 5 N. Y., 537 ; 23 Wend., 309 ; 1 Hill, 486, 488 ; 5 Hill, 77, 78 ; 2 Barn. & Cress., 821.) The officers of a bank are the agents of the corporation, and are liable for an abuse of their trust whenever the agents of an individual would be. (*Austin* v. *Daniels,* 4 Denio, 299 ; Angell and Ames on Corp., §§ 310, 312, 314 ; Story on Agency, 207 *c.*) For a neglect or omission of duty by which injury is sustained, a cashier is liable. (*Miner* v. *Bank of Alex.,* 1 Peters, 70 ; Angell and Ames on Corp., §§ 412, 414; Story on Agency, § 217 *c.*) Without adopting defendant's act, so as to entitle it to any claim which existed against Seyton & Wainwright, the bank could hold him liable. (*Lawrence* v. *Fox,* 20 N. Y., 268.) It was not in the power of the president and cashier to assign the Reynolds mortgage without a

resolution of the board of directors. (Rev. Stat., 501, § 8; *Gillett* v. *Phillips*, 14 id., 118; *Highland Bank* v. *Dubois*, 5 Denio, 558; *Burdick* v. *Austin*, 21 Barb., 241.) The direction of the president that this security be surrendered, is no defence to defendant, nor does it mitigate his liability. (*Austin v. Daniels*, 6 Denio, 290; *Miner* v. *Bank of Alex.*, 1 Peters, 70; *Barrington* v. *Bank of Washington*, 14 Sergt. and Rawle, 299.)

*Lyman Tremain* for the respondent. Defendant was bound only to the exercise of good faith and ordinary care and diligence. (*Lawlor* v. *Keoquick*, 1 J. C., 174; *Evans*, v. *Potter*, 2 Gall., 13; *Scott* v. *Depuyster*, 1 Ed. Ch., 513, 534; *Liotard* v. *Graves*, 3 Caines, 226; 1 Greenlf. Ev., 34.) Defendant was guilty of no improper act in certifying Wilson's check. (*Cartwright* v. *Wilmerding*, 24 N. Y., 534.) Nor was he so guilty in sending the bonds to Seyton & Wainwright. (*Wheeler* v. *Newbould*, 16 N. Y., 392.) The bank has lost nothing by this, as the brokers are responsible and are liable. (*Marvin* v. *Elwood*, 11 Paige, 365; *Bates* v. *Stanton*, 1 Duer, 79; *Hale* v. *Boardman*, 27 Barb., 82; *Lawrence* v. *Fox*, 20 N. Y., 268.) It is a good defence that the act complained of has been followed by no loss. (Story on Agency, § 236; Sedg. on Dam., 32.)

EARL, C. The defendant, as cashier, was a financial agent of the plaintiff, entrusted to some extent with the management of its affairs. As such agent he was bound to exercise reasonable skill and ordinary care and diligence in the discharge of his duties. (Story's Agency, § 182, etc.) If he failed in such skill or omitted such care and diligence, and in consequence thereof the plaintiff suffered damage, he is liable to respond. And much more is he liable to respond if he caused any damage to the plaintiff by any illegal, fraudulent or tortious act

It is not claimed, on the part of the plaintiff, that the defendant was guilty of any fraudulent act, or that he made

any personal profit out of the transactions of which the plaintiff complains. But his liability for the damages claimed is sought to be enforced on the ground that he omitted or violated some duty of skill or diligence which he owed to the plaintiff.

For some time previous to June, 1860, Schoolcraft was the president and chief financial officer of the plaintiff, receiving a large salary, and the defendant was his subordinate; and he made to Wilson the loan of $14,000 January 4, 1860, and took from him the Reynolds mortgage and other collaterals, and delivered Wilson's note and the collaterals to the defendant to be placed by him in the cashier's chest. With this loan the defendant had nothing whatever to do; and as Wilson was a man of high character and undoubted credit, he had no reason to suspect that it was in any way improper. About a month after this loan Schoolcraft informed him that Wilson could permanently "place" Reynolds' mortgage (meaning thereby, doubtless, that Wilson had found a place where he could dispose of the mortgage and realize the money for the same), and directed him to give the same to Wilson that he might thus dispose of it and this the defendant did. In doing so, it is impossible to perceive how he incurred any liability. He acted under the direction of his superior, and the object was, as we must infer, to enable Wilson to raise the money upon the mortgage and pay his loan. There is no proof or finding that there was any improper collusion between Schoolcraft and Wilson; and when we consider that Wilson was supposed to be perfectly responsible and honest, and that the bank had other collateral security to the nominal amount of $12,500, which was not known to be worth less, the delivery of the mortgage to him, under the circumstances, does not show the absence of that care and diligence which the defendant owed the plaintiff. The whole transaction was not an extraordinary one, and might well have occurred between the vigilant officers of any bank and a person of the standing and position occupied by Wilson.

The learned counsel for the appellant claims that, in delivering up this mortgage, the defendant did an illegal act, as he violated the law (1 R. S., 591, § 8) which provides that no conveyance, assignment or transfer of any of the real estate or effects, exceeding in value $1,000, of a moneyed corporation shall be made, which is not authorized by a previous resolution of the board of directors of such corporation. To this claim there are two answers, both quite satisfactory : First, this mortgage was not, within the meaning of the law, assigned or transferred to Wilson; he was simply entrusted with it, that he might raise the money on it and pay his loan to the bank; second, the bank held the mortgage as pledgee, and it would be an unreasonable construction of this law to hold that in such a case the financial officers of a bank cannot, without a previous resolution of the board of directors, sell the property pledged, whether it be bonds, stocks or mortgages, to realize the money secured by the pledge.

Hence, I can see no reason for holding the defendant liable on account of this loan of $14,000 or the surrender of the Reynolds mortgage to Wilson, and I will proceed to examine the other and more important claim made against him.

In September, 1860, the State owned $100,000 of stock, which it had loaned to the Auburn and Rochester Railroad Company, and which was payable January 1, 1861, and it held, as security for such stock, ninety-two New York Central railroad bonds of $1,000 each, and accrued interest. Wilson was treasurer of the railroad company, and feared, if the State should suddenly place these bonds upon the market, it would depreciate their value. He therefore applied to the defendant for a loan to take up the bonds, and it was arranged that he should draw his check for the amount, $93,073.33, and that he should go to the comptroller of the State and get the bonds and deposit them with the plaintiff as collateral security for the loan, and that the plaintiff should hold them until they could be gradually disposed of. The check was drawn, payable to the order of the comptroller, and certified by the defendant to be good. Wilson delivered it to the comp-

troller, and within one hour thereafter delivered the bonds to the defendant. So far, no harm was done to the bank. It had made the loan, and had ample security for it ; and it was an advantageous loan, as the bank was to receive seven per cent, and the check was to be deposited in the bank by the comptroller, the bank paying but four per cent. There seems to have been no want of prudence in this transaction on the part of the defendant. The check was drawn to the order of the comptroller, so that it could not be diverted from the use intended, and the only risk was that Wilson might take the bonds and keep them instead of bringing them to the bank, and this risk, in the case of a man of his character and standing, was no greater than it would have been if any officer or clerk of the bank had been entrusted with them.

While this was in form an overdraft, as Wilson did not, when he drew the check, have the funds in the bank, yet it was really a loan, and the check was taken as a mere voucher to be held by the bank. I do not, however, assent to the claim of the counsel for the appellant, that a cashier, in all cases, becomes personally liable when he permits an overdraft. It is not an uncommon thing for bankers to permit overdrafts, with an understanding that the account should be made good before the close of banking hours on that day, or soon after ; and whether such overdrafts are prudent or not depends upon the character and standing of the drawer, and upon the circumstances of each case. Hence, if nothing more had been done as to this loan and these bonds, the plaintiff could not well have complained that the transaction was imprudent, and that the defendant had in any way incurred any liability. Within ten days, ten of these bonds were sold, and the proceeds placed in the bank. In about three months the defendant urged Wilson to close up the loan, and he then gave the defendant a sight draft for $70,000 on Seyton & Wainwright, brokers, of New York, and directed him to forward the bonds to them to protect the draft. This the defendant did, by express, taking a receipt from the express company.

Wilson informed the brokers by letter, first submitted to the defendant, that the bonds would be thus forwarded, and that they should sell them at par and accrued interest, and that they should hold the proceeds, beyond the $70,000 subject to the order of the defendant, as cashier. They sold thirty-two of these bonds from time to time up to March 2d, 1861, and on the 20th of April they sold the remaining fifty of the bonds, under the instructions of Wilson, for $50,000. Wilson died on the 3d day of July, 1861, and never until after his death did the defendant make any inquiries after the bonds or their proceeds.

There certainly was no want of prudence or proper care on the part of the defendant in sending the bonds to the brokers. They were sent through a responsible express company to a responsible firm of brokers that they might be sold, and the money realized to pay the balance of the loan. But the referee found that the defendant was negligent in omitting for so long a time to inquire of Seyton & Wainwright as to the bonds, for the purpose of getting the balance due the bank ; and if the bank had suffered any loss from this negligence, it may be that the defendant would have been liable.

But the bank did not suffer any loss from this negligence. The brokers are perfectly responsible, and able now to respond to the bank. The bonds belonged to the bank as pledgee, and they were ordered to sell them and hold the balance of the proceeds, subject to the order of the bank. And they had no right, upon the facts found by the referee, to make any other disposition of this balance. They wrongfully applied it upon their claims against Wilson ; but they gave him no new credit, and incurred no new liabilities upon the faith of these bonds, and nothing appears showing that they have any defence whatever to the claim of the bank for this balance. The bank has not even claimed this balance of them. I do not, therefore, perceive how the bank can claim that they have suffered any loss which can be cast upon the defendant. The defendant was guilty of no wrong in sending

the bonds to the brokers. The only omission of duty with which he can be charged is in not looking after them and calling for the balance. But this omission caused no damage. The balance due the bank is in the hands of the brokers and can be procured. For this balance the defendant is no more liable than he would have been if there had been an overdue note for the same amount against the brokers, which he had for an unreasonable length of time neglected to collect, the brokers remaining perfectly responsible.

The brokers were notified by Wilson that he had given a draft to Ten Eyck as cashier for $70,000, and that the bonds would be sent by him to them by express, and that they could sell them and pay the draft, and hold the balance subject to the order of Ten Eyck, plainly meaning Ten Eyck as cashier. The bonds were sent by express in a package marked and sealed as from the bank. Here were facts sufficient at least to put the brokers upon inquiry as to the interest of the bank in the bonds, and the right of the bank to the surplus; and they must be held to have acquired all the knowledge they would have received if they had made the inquiry. Hence they must be held as dealing with this surplus, with full knowledge of the rights of the bank, and I am unable to see how they could claim or dispose of it so as to defeat the claim of the bank.

Having thus given this case the careful consideration which its importance demands, I have reached the conclusion that the judgment should be affirmed, with costs.

All concur.

Judgment affirmed.