## First National Bank of Sturgis v. Richard Reed.

*Evidence: Opinion of party as to his liability: Relevancy.* Where it is sought to hold one who while president of a bank had loaned moneys of the bank to an irresponsible person, liable for the same on the basis of his representations to the cashier at the time of the loans that he was interested with the borrower and would see the amounts repaid, it is error to permit the party to testify whether he ever regarded himself as liable; his opinion respecting his legal liability had no bearing on the case.

*Banks: President: Breach of trust: Loans to insolvent person: Agency: Adverse interests.* A bank president who, while in general charge of the business with the cashier under his authority, has permitted and directed the drawing of moneys from the bank without security by one known or supposed to be irresponsible, and with whom he was interested in the business for which the money was obtained, and has requested the cashier not to say any thing to the directors about it, is held personally liable to the bank for the moneys thus paid out by him in violation of his trust.

*Fraud: Agent: Credit: Books of account: Collusion: Notice.* The fact that the moneys thus drawn out were by the cashier, by direction and on the authority of the president, charged on the books of the bank to the irresponsible borrower, would not necessarily determine the transaction as a loan to him by the bank; but the bank, in the absence of any act of ratification or acquiescence on its part, would have a right, under the circumstances, to repudiate it as a transaction with the nominal borrower, and to insist on repayment by its president.

*Agency: Breach of trust: Accessory: Notice.* And such president, if he persuaded the cashier not to make known the facts to the directors, could claim nothing because of the cashier's knowledge; that officer's silence might, under such circumstances, make him accessory to the fraud, but could not tend to excuse the principal.

*Silence: Ratification: Question of fact.* The question of the effect to be given to the long silence of the bank directors after the charge to the nominal borrower was entered upon the bank books, is one of ratification, and should be submitted to the jury as such.

*Submitted on briefs April 6. Decided April 17.*

- Error to St. Joseph Circuit.

*Upson & Thompson,* for plaintiff in error, as to the irrelevancy of the inquiry whether Reed regarded himself as liable, argued that the opinion of the party as to his liability was not evidence of any fact in the case relevant or material to the issue; and that it was not a question of science or skill, or of the kind admitting of the opinion of experts: *1 Greenl. Ev.,* § *440.*

The authority of Reed to control and manage the business of the bank gave him no power to use the money in any other

than its legitimate business, much less to deliver it over to any one who might draw a check in his own favor on the bank, when he had no money on deposit there, and no bank account there, and also without taking any personal security for the moneys so paid out. Reed had no authority to take this money from the bank, under the circumstances disclosed by. the evidence, and let Bennett have it, and he knew it. Neither he nor the cashier could lawfully do so, or engage the bank in a potato speculation, and it is questionable even if the directors had any such power as Reed assumed to exercise: *Laws U. S. 1863-4, Act of June 3, 1864, § 8; Bank v. Bennett, 33 Mich., 520; Ang. & Ames on Corp., §§ 298-9, 301.* The money taken by Reed and delivered to Bennett was known by Reed to belong to the bank, and he let Bennett have it to use in a potato speculation, illegally and without any security, and when he knew Bennett was insolvent, and he is liable to the bank for the money: *Ang. & Ames on Corp., § 314; Colt v. Steward, 50 N. Y., 17; Harway v. New York, 1 Hun, 628; Austin v. Daniels, 4 Denio, 299.* Reed also was an interested party with Bennett in the transaction, and this made his interest adverse to that of the bank, and he could not in the matter be acting as the agent of the bank, or bind the bank by his acts: *Story on Agency, § 210; Stone v. Hayes, 3 Denio, 575; Stevenson v. Bay City, 26 Mich., 44.* In such a business arrangement with Bennett, Reed, in taking the money and letting Bennett have it, was not acting as president of the bank, but in his individual capacity, and the bank was not chargeable with the knowledge he may have had on the subject; the directors were not in legal identity with him, either as to his acts or his information in respect to it: *Ang. & Ames on Corp., § 308; Seneca Co. Bank v. Neass, 5 Denio, 337; Weisser v. Dennison, 10 N. Y., 68; Manufacturers' Nat. Bank v. Barnes, 65 Ill., 69; 34 Mich., 30.* The charging the money on the books to Bennett was the act of Reed himself and not of the bank, and he could not change the nature of the transaction by any such device; and the directors were not notified of it, but knowledge of it was kept from them by Reed's efforts, and the matter never appeared among the discounts of the bank.

*J. B. Shipman* and *H. H. Riley*, for defendant in error, as to the admissibility of the inquiry as to whether Reed regarded himself as liable, cited: *19 Mich., 57; 14 N. Y., 471; 6 Am., 460;* that at all events its admission could not have prejudiced, as the jury had all the evidence of the defense, to fix plaintiff's

liability on the set-off, if he was liable: *27 Mich., 451; 28 Mich., 432;* and the jury were charged that if they found certain facts the plaintiff *would* be liable, notwithstanding his opinion on the subject.

The president and cashier being authorized generally to do the business of the bank, *their* knowledge was the knowledge of their principal, the bank. If a person acts notoriously as the president or cashier of a bank, and is recognized by the directors or the corporation as an existing officer, a regular appointment will be presumed, and their acts will bind the corporation: *Story on Agency,* § *52; Ang. & Ames on Corp., 270; 1 Doug., 106, 457; 4 Mich., 606; 14 Mich., 208; 12 Barb., 67; 12 Cush., 1; 4 Cow., 645; 8 Conn., 472.*

The silence of the directors for three or four years after Bennett's account had been openly charged to him on the journal at the bank, with the credits, was ratification: *36 Conn., 325; 4 Am., 80; 9 Bush, 609; 15 Am., 731; Morse on Banking, 107; 4 Mich., 606.*

If the president and cashier, or either, were to be "presumed, in the absence of proof to the contrary, to act within the scope of their power" (making discounts being among them), then the delegated power, proved to have been given to them, to make discounts, renders every contract made by them for the bank in good faith *final,* whether the bank or its board of directors had *actual* knowledge of the same, or did or did not *affirmatively* assent thereto as a *board* by action, or whether they had thereupon made a discount to a solvent or insolvent man, in the language of plaintiff's requests. The acts of the officers are the acts of the bank *as soon as performed,* and the charge as given was favorable to plaintiff in error.

It being admitted that the money paid on Bennett's checks were charged to him upon the books of the bank, and so remained for three or four years, it is to be presumed, in the absence of other evidence, that this fact come to the knowledge of the directors in due course of business, and this presumption can only be overcome by proof: *Morse on Banking, 107; 36 Conn., 325; 4 Am., 80; 15 Am., 731.*

The question as to whom the *original* credit was given was the central fact in the case, and upon it turned the question of set-off; and this was fairly submitted to the jury and found against the defendant.

Cooley, Ch. J:

In a suit brought by Reed against the bank to recover

for dividends due him on stocks, the bank sought to set off certain sums which he, when acting as president of the bank some years ago, had paid out or directed to be paid out to one Bennett under circumstances which it is claimed should render him personally liable. It was shown very clearly that while Reed acted as president he took general charge of the business, and that the cashier obeyed his directions. The first item in dispute was two hundred dollars drawn by Bennett, Dec. 16th, 1869. The cashier's testimony was, that this was paid to Bennett by Reed out of banking hours when the witness was not present, and that when he came in and inquired about it, he told Reed the directors would not like to open an account with Bennett, as he was insolvent, but Reed told him to charge it to Bennett, and he, Reed, would see it paid; that Bennett was to use the money in buying potatoes, and would send the money received therefor to the bank. The next item was one of five hundred dollars which Reed allowed Bennett to draw in the cashier's absence, December 27th, 1869. In respect to this the cashier testified that when it was brought to his attention he objected to it, but Reed directed him to charge it to Bennett, and said that he, Reed, would see it paid, and added that he was interested with Bennett in the profits of the potatoes. The cashier also gave evidence that Reed at various times requested him to say nothing about these transactions to the directors, and he would settle the matter. This statement of evidence is perhaps sufficient to admit of a proper understanding of the legal questions. The set off which was claimed, embraced the two items mentioned, and a further sum of five hundred dollars which Bennett was allowed to draw a little later.

Reed was sworn on his own behalf, and his attention being called to the sums drawn out by Bennett, he denied having told the cashier he was interested with Bennett, and also denied having agreed to see the amounts repaid. He was then asked this question: "Did you ever regard yourself as liable?" and was allowed against objection, to reply:

"I never did." This question and answer were manifestly objectionable. They put before the jury no fact beyond the state of mind of the witness at the time, and that had no necessary bearing on the case. He might have promised to see the moneys repaid, and yet have believed he was not liable to do so; or he might have so believed because he had never promised. The answer, therefore, gives us no information of any value whatever, and the purpose could only have been to influence the jury with the witness' opinion respecting his legal liability; an opinion with which they had no concern.

The judge, in submitting the cause to the jury, was requested to instruct them that "if the jury find from the evidence that the plaintiff at the time he was president of the defendant, took and delivered or caused to be taken and delivered to Bennett, without the knowledge of the defendant, in the months of December, 1869, and January, 1870, the three several sums of money testified about in this cause, he, the plaintiff, knowing or having good reason to know that the said Bennett was insolvent, then the defendant should be allowed the amount of the moneys as a set off." This request was refused, and in stead thereof the judge instructed the jury that "if the money paid on Bennett's check and telegram was on Bennett's account, if the credit was given to him originally, and not to Reed, then and in that case it cannot be made a charge against Reed by reason or because of any interest which Reed may or may not have had in the potato business with Bennett."

The instruction refused and that which was given must be considered in the light of the evidence which showed that the original transaction with Bennett was one in which no one participated but Reed himself; that it was in effect a loan to a person supposed at the time to be irresponsible, without taking any security, and that it was charged to Bennett only on Reed's authority. We do not think such a charge would necessarily determine the transaction as a loan from the bank to Bennett; on the contrary, we think

that the bank, independent of any subsequent act of ratification or acquiescence, would have had a right to repudiate it as a transaction with Bennett, and to insist on repayment by Reed; especially if it should appear that Reed was interested with Bennett in the business for which the money was obtained.

Taking the statement of the cashier as true, the act of Reed in allowing Bennett to draw moneys from the bank was wholly irregular and unwarranted. It was without the knowledge of the proper financial officer of the bank,—the cashier,—and without taking security. These facts, in connection with the supposed insolvency of Bennett, made it a gross breach of trust. It is not to be suggested that the directors had in law notice of the transaction, for it is shown that no one knew of it but the president himself. We therefore regard the case as within the decision in *Austin v. Daniels, 4 Denio, 299,* in which it was held that bank officers who abuse their powers must personally account to the bank for what it shall suffer thereby. See also, *Commercial Bank v. Ten Eyck, 48 N. Y., 305.* This is fundamental law, and only applies to officers of corporations the same rules which are applicable to the agents of individuals. A loan by the president under the circumstances indicated would be a fraud on the bank; and the president, if he persuaded the cashier not to make known the facts to the directors, could claim nothing because of the cashier's knowledge; that officer's silence might make him accessory to the fraud, but could not tend to excuse the principal.

We cannot undertake on this record to determine what effect should be given to the long silence of the bank directors after the Bennett account was entered on the books. As before stated, the question is one of ratification, and should be submitted to the jury as such.

The judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.