JOHNSON, Appellant, vs. STOUGHTON WAGON COMPANY, Respondent.

SAME, Respondent, vs. SAME, Appellant.

*June 4—June 18, 1903.*

*Corporations: Managing officer: Duties and liabilities: Master and
servant: Contract of employment for "full time:" Ambiguity:
Negligence of officer: Collection of claims: Equity: Accounting:
Agency.*

1. The managing officer of a corporation owes to the corporation
the duty of absolute good faith, and such diligence, judgment
and exertion as the ordinarily capable, diligent, and prudent
man would give under like circumstances.
2. Among such circumstances are the character of the service to be
rendered, the conditions under which it was compelled or expected to be performed, the means therefor, or which were
within the officer's power, and the extent to which attention to
detail was consistent with proper consideration and direction
of the more important general policy.
3. An agreement with a corporation by a managing officer "to give
his full time to the company's service" is, in its nature, ambiguous, and does not require twenty-four hours a day of the
officer's time, nor, indeed, every moment of his waking hours,
but it does require that he shall make the employment his
business, to the exclusion of another business such as usually
calls for the substantial part of a manager's time or attention.
4. Plaintiff, as managing officer of defendant corporation, agreed
"to give his full time to the company's service."  He had pre-

Johnson v. Stoughton Wagon Co. 118 Wis. 438.

viously been in business as a merchant, which he gave up. He devoted his entire business days, of approximately nine hours, persistently to the defendant corporation, and, in addition, spent approximately one half of his evenings in devotion thereto. *Held*, that the trial court was justified in finding that the evidence did not sustain an allegation of failure to devote his full time to defendant corporation, although, at the same time, he looked after his mother's estate, the financing of another corporation, and occupied a place on the directory of a bank, there being no evidence of pecuniary loss to defendant therefrom.

5. Plaintiff, the managing officer of defendant corporation, on learning that the secretary had allowed another corporation to become a large debtor, called upon the book-keeping department of defendant to furnish him a statement of the amount of that debt, and promptly collected the amount so shown. *Held*, that no negligence on the part of the managing officer was thereby shown, although the debt was larger by reason of interest charges not shown by such statement.

6. Where the managing officer of a corporation secured loans of money to it through his personal connections, at the same rate of interest at which he permitted his mother's estate to borrow money from the corporation, he is not liable for a failure to collect interest from the estate at the rate which the corporation was then paying for money at a bank; there being no showing that the amount of money received through the manager's personal efforts was not equal to the amount loaned to the estate.

7. Where the managing officer of a corporation directed the secretary to collect an overdue amount against a corporation in which the manager was interested, and the secretary reported the amount had been assumed by an entirely responsible person, who afterward repudiated the alleged transaction, and entries were made on the books in accordance with the secretary's statement, it was not negligence on the manager's part to omit to discredit the secretary's statement, and investigate the facts as to the alleged assumption of such debt.

8. Where the managing officer of a corporation did not discover that its secretary had been withdrawing funds in excess of his salary until this had been going on for seven years, and then permitted the secretary to remain in office for several months and appropriate more funds, under the belief that he might reform and reduce his overdrafts, it is within the judgment of the trial court, in drawing inferences of fact, to hold that the ordinarily diligent man, in the managing officer's position,

would have discovered the depletion of the corporation's funds
long before it was done, and supports a conclusion that the
whole amount of the overdrafts was damage resulting from the
manager's neglect to discover it in proper time, for which he
was liable to the corporation.

9. The secretary of a corporation, on the day he was discharged,
entered upon the corporation books a certain sum stated to be
a number of turned accounts, viz: where the secretary had re-
ceipted the accounts of debtors to the corporation in consider-
ation of the discharge of his own indebtedness to such debtors.
The items composing such sum were not in evidence, were not
entered on the books, and it did not appear that the managing
officer of the corporation ever had any knowledge thereof, or
information of any fact in regard thereto to put him upon in-
quiry. *Held*, that there was nothing of negligence on the man-
ager's part to which can be ascribed the loss to the corporation
of those particular accounts, if they were lost.

10. In such case, the fact that the debtors of the corporation gave
as consideration only a cancellation of the secretary's personal
liability to them, charged them in the fullest manner with no-
tice of his breach of duty as an agent, and they remained, as
before, the debtors of the corporation.

APPEALS from a judgment of the circuit court for Dane
county: R. G. SIEBECKER, Circuit Judge. *Reversed on
plaintiff's appeal.*

From some time prior to 1889 the defendant was a corpo-
ration engaged in the manufacture of wagons at Stoughton,
built on the ruins of a previous business. In February, 1891,
the plaintiff was elected president and treasurer at a salary
of $1,000 a year, at which time a resolution was adopted that
he should devote his full time to the service of the corpora-
tion. In 1893 he was elected superintendent. Amongst the
duties of treasurer prescribed by the articles of incorpora-
tion, the treasurer was required to keep the moneys, notes,
bills receivable, and securities of the corporation, collect all
debts due it, disburse its moneys, and keep correct accounts
of moneys, and business transacted by him for the corpora-
tion. As superintendent, his duties were not defined, but
were those of a detail superintendent of the manufacturing

branch of the business, in which were employed from 120 to 170 men. By virtue of all three offices, he had general supervision and control of the entire business of the corporation, as he testifies. He continued to hold all three offices up to March, 1901. During a good share of the time he advanced moneys to the corporation, and allowed his salary to remain undrawn, so that there was a credit balance amounting at the time of his retirement to $3,436.63, increased by interest to the time of the judgment to the sum of $3,630.37. He brought suit for this balance. The defendant, admitting the holding of the offices and the agreed salary during the periods named, set up by way of defense a counterclaim that plaintiff did not devote his entire time, but engaged in several other enterprises. First, that he at all times was manager of the Johnson estate, of some $75,000, apparently owned by his mother; that from about 1892 he was a stockholder to the extent of $500 in, and president of, the Stoughton Electric Light Company, to which, however, according to the findings, he gave no specific attention; that he was both before and after his employment a partner in a large clothing store, under the firm name of Johnson & Melaas, to which, however, after his employment, the court finds he devoted no business time, but, on the contrary, paid his partner a compensation by reason of his nonattendance thereto; also that from 1897 to 1899 he became interested in a business of manufacturing sadirons, to which he gave considerable business time. The evidence discloses and the court finds that he was only interested in protecting the treasury of said business, which belonged to his brother, and for that purpose received its moneys, and drew the checks and drafts for its disbursements, Also it was asserted that he accepted the vice presidency of the First National Bank of Stoughton in 1899, but the evidence shows plainly that he devoted no attention to the affairs of the bank, except to attend directors' meetings at intervals of from one to three months, and that, as a considera-

tion of his accepting the position, he was given the privilege,. on behalf of the defendant, of drawing its drafts without exchange, resulting in a gain of some hundreds of dollars to that company. The counterclaim was based further upon the allegation that he permitted the business of the electric light company to be conducted in the office of the defendant by the secretary thereof, who was also secretary of the electric light. company, and that thereby services of employees of the defendant were diverted to its damage, but, more especially, that during that period the electric light company was allowed to largely overdraw, and that in settlement therewith it was charged only straight annual six per cent. interest, whereas the company was during a part of that time paying eight per cent. to the bank, compounded at four-month periods, and during the remainder six per cent., compounded at like periods. The court found that plaintiff had no knowledge of the fact of overdraft by the electric light company until about August, 1895, when it had reached something over $7,000; that thereupon he called on the bookkeeping department for information as to the amount due, inclusive of interest on the overdraft, and upon the information so furnished he immediately forced settlement and payment; that the amount of interest so collected was some $600 less than the electric light company ought to have paid the defendant, but that loss therein was not chargeable to the negligence of the plaintiff. Another ground of counterclaim was that a certain cash register company, in which plaintiff was a small stockholder, was allowed to become indebted to the defendant for various articles sold it, and that the amount of such indebtedness was not collected while that company was solvent, and was finally lost upon its insolvency. The facts disclosed were that the plaintiff, finding an account against this company amongst the overdue accounts, directed the secretary to enforce its collection. The secretary went ostensibly to do so, and came back and entered the account as paid, and charged

the amount thereof to one Olson—an entirely responsible person—claiming that he had assumed it. It thus remained on the books of the defendant until after the cash register company had become insolvent, when Olson repudiated his assumption of the debt and it never was collected. The court found that this loss did not occur through negligence of the plaintiff; he having no knowledge but that the account was paid, as the book entries indicated. Another item of counterclaim was the contention that plaintiff allowed the estate of which he was the manager at times to overdraw its accounts with the defendant to considerable amounts, and charged it only six per cent. interest. It appeared that while bank interest was eight per cent. during the first year or two of his incumbency, and six per cent. thereafter, he was, on behalf of the company, at all times borrowing considerable amounts at a straight rate of six per cent., of which at least a part was furnished by himself. The court found him under no liability for difference of interest upon the overdraft of the estate. Another element of counterclaim was upon permitting the secretary, Lund, to persistently overdraw his account, such overdraft increasing from year to year until September, 1897, when it reached the amount of approximately $3,000, after which the secretary was still retained, under a promise to apply part of his salary toward reducing this overdraft; but, failing to do so, and, on the contrary, increasing it several hundred dollars, he was discharged in February, 1898, when the overdraft upon the books had reached the amount of about $3,100, plus notes of the amount of about $500 which he had from time to time given to the company and credited against his overdraft. At the time of his discharge, Lund added to this account a charge of $409.70 for what are called "turned accounts," namely, accounts owing to the company which he had receipted in consideration of the discharge of indebtedness due from him to such several debtors of the defendant. The court found that while the plaintiff had been

ignorant of this overdraft up to September, 1897, he had been negligent in allowing it to continue and grow, and, as Lund was entirely irresponsible and insolvent, held that the company had been damaged in the amount appearing on the ledger, with interest from the commencement of the overdraft; also for the $409.70 of turned accounts; also for the amount of the notes which Lund had given, together with interest thereon; also for an item of $145.79, known as the "Robe Dow Account," as to which the facts appear in the opinion.    On all these items interest was charged up to the date of the finding, June 11, 1902, making a total of $4,510.83, from which the conceded indebtedness to the plaintiff was deducted, and a judgment of $880.46 in favor of the defendant entered, with costs.    It appeared that Lund had been in the position of secretary prior to plaintiff's election to office; that he enjoyed a high reputation for efficiency and accuracy; that amongst the duties of the secretary were those of the keeping of the books of account.    In practical operation, the entire bookkeeping was conducted under his supervision, with which plaintiff had no contact in detail; simply calling for such summary information therefrom as he needed from time to time to guide him in his general supervision of the business.    Lund also had equal power with the president and treasurer to draw checks, and habitually received all incoming moneys.    He earned a salary during most of the period of plaintiff's incumbency of office of $2,000 a year.    The plaintiff appeals from the allowance on the counterclaim, and the defendant appeals from the disallowance of the various other counterclaims.

For the plaintiff there were briefs by *Clancey & Loverud* and *Rufus B. Smith,* and oral argument by *Mr. J. M. Clancey* and *Mr. Smith.*

For the defendant there was a brief by *Jones & Stevens,* and oral argument by *Burr W. Jones.*

DODGE, J. In approaching the crucial questions of fact in this case, an understanding of the general situation is a preliminary necessity, especially as the two litigants base their respective arguments upon radically different estimates thereof. The defendant proceeds upon the theory that plaintiff, as executive head of the business, was bound to know of and control every detail of every department thereof, and is liable for damages resulting from any act or omission which would have been negligent in one charged with the duty of such specific act. Plaintiff, on the other hand, contends that he is under no responsibility outside of certain defined departments of the business, and especially that the field of activity delegated to the secretary, either by express by-law or the custom of the corporation, was wholly outside of his responsibility; that he and the secretary were co-ordinate officers, each independent and beyond the control of the other, and each responsible only for his own acts and omissions. Cases are cited bearing upon the measure and limits of liability upon these conflicting theories. Neither is entirely right, according either to evidence or finding. Plaintiff was not a mere co-ordinate of the secretary, each having entire independence of the other. He was the head of the business, charged with its entire general management, including finances, accounts, and collections; but, on the other hand, the secretary and the bookkeeping force working under him were not a mere implement selected and entirely controlled by plaintiff. The secretary and his account books were existing institutions when plaintiff took office, created by the board of directors, and in detail, at least, not controllable by plaintiff, except by appeal to that board. They constituted, with the secretary's authority to pay out money, one of the conditions under which plaintiff must manage the business. Nevertheless, the conduct of that department being one of the elements involved in successful prosecution of the business, we have no

doubt plaintiff owed duty of such attention thereto and su-
pervision thereof, consistent with the limitations suggested,
as the general prosperity of the enterprise demanded. Plaint-
iff's duty, like that of all paid corporate officers, was that of
absolute good faith, and such diligence, judgment, and exer-
tion as the ordinarily capable, diligent, and prudent man
would give under like circumstances. 4 Thomp. Corp. § 4671;
21 Am. & Eng. Ency. of Law (2d ed.) 874; *North Hudson
B. & L. Asso. v. Childs,* 82 Wis. 460, 52 N. W. 600; *Briggs
v. Spaulding,* 141 U. S. 132, 11 Sup. Ct. 924.    Among those
circumstances are the character of the service he was to ren-
der, the conditions under which he was compelled or expected
to perform it, the means therefor which he had, or which were
within his power to have, the extent to which attention to de-
tail was consistent with proper consideration and direction
of the more important general policy, and very many others.

Taking up first defendant's defensive contention that
plaintiff has failed to perform his contract of service, by rea-
son of the devotion of some portion of his time and attention
to other affairs—especially the care of his mother's property
and investments, but also the performance of his duties as
vice-president of a bank, and the looking after the finances of
the sadiron business—we cannot feel justified in disturbing
the finding of the court that no substantial breach, to the in-
jury of the defendant, occurred.    Of course, an agreement
"to give his full time to the company's service" is, in its na-
ture, ambiguous.    It certainly does not require twenty-four
hours a day of an employee's time, nor, indeed, every moment
of his waking hours. *Mobile & K. C. R. Co. v. Owen,* 121
Ala. 505, 25 South. 612.    On the other hand, it undoubtedly
does require that he shall make that employment his business,
to the exclusion of the conduct of another business such as
usually calls for the substantial part of a manager's time or
attention.    We cannot think, however, that the business man
who undertakes to make the affairs of a corporation or of a

firm his business, and to give to it his full time, absolutely
excludes himself from everything else.    Usually such men
have some private affairs or interests of their own, which
they are not expected to entirely abandon.    They may seek
and make investments of their private funds, so that they do
not trespass substantially upon the ordinary business hours;
and, in analogy, it certainly is recognized as customary that
they may give the benefit of their judgment and supervision
to the care of moneys of relatives not able to protect their own
interests.    It is also certainly customary that men who con-
sider themselves engrossed in active business do not hesitate
to occupy places on the directory of banks, or even more im-
portant offices in such institutions.    It would be unfortunate
indeed for the community if a line must be drawn so strictly
that only people whose services were not needed in the conduct
of important business could occupy such positions.    In this
case it is made apparent that plaintiff devoted more than
ordinary business hours to this corporation.    He previously
had a business as a dry goods merchant, which he gave up.
He devoted his entire business days, of approximately nine
hours, persistently to the defendant corporation, and in addi-
tion—what is certainly in excess of the strict contract re-
quirement—he spent approximately one half of his evenings
in devotion thereto.    In the light of such facts and consid-
erations, we do not feel justified in repudiating the conclusion
of the trial court that the evidence does not sustain the allega-
tion of failure to give his full time to the service of the de-
fendant.    There is no evidence of any pecuniary loss to the
defendant from the mere fact that plaintiff looked after his
mother's estate, or after the finances of the sadiron business,
or that he occupied the vice-presidency of the bank; hence no
counterclaim is sustained upon these facts.

As to the failure to collect from the electric light company
some $600 of interest which the court finds was justly owing
to the defendant, we also agree with the trial court that

plaintiff's liability is not established, and we put our agreement upon the ground that no negligence on the part of the plaintiff is shown, in failing to collect that amount. When plaintiff first found that the secretary had allowed the electric light company to become a large debtor, his conduct in putting a stop to it is characterized by most emphatic diligence. He allowed no delay—hardly reasonable time for the electric light people to examine the account before compelling that company's officers to pay the debt. He called on the bookkeeping department to furnish him a statement of the amount of that debt, and he collected the amount so shown. We are not prepared to say that it is negligence, in law, for the general manager of a business of this magnitude to rely upon trusted employees, justly supposed to be diligent and capable, for the mere ascertainment of the amount due upon an open account. It surely is not unusual for men whose attention to general affairs is of so much more importance to their corporate employer than would be their knowledge of the mere detail of figures in books to refrain from personal inspection of all the items going to make up an account, and to act upon the reports made to them by those who are charged with such details. For this reason, even if it be conceded that the amount found by the trial court was due from the electric light company, of which we have some doubt, we reach the conclusion that the finding that no damage resulted to the company from negligence of the plaintiff in that matter is sustained.

Another basis of counterclaim which was repudiated by the trial court is the failure to enforce payment from his mother's estate of more than six per cent. annual interest upon her overdrafts. That the company suffered loss thereby is predicated upon the alleged fact that at the time of any such overdrafts the company was paying a higher rate of interest to the bank; but, as pointed out by the statement of facts, the company was also at all such times in the enjoyment of con-

siderable amounts of money at exactly the rate which was charged to this estate, some parts of which, at least, were supplied by the plaintiff himself, or through his personal relationship to the lenders. It is not shown that even such personal contributions to the finances of the company were not fully equal to the amount of such overdrafts. Surely if plaintiff with one hand borrowed for the company an amount which he allowed to be borrowed from it with the other at the same rate of interest, his act could not be held to have caused pecuniary damage; hence we conclude that the court rightly refused allowance of any damages against plaintiff in this respect.

We also concur with the trial court in finding plaintiff not liable for the loss of the account against the cash register company. When he had directed it to be collected, and was, in effect, informed that it had been, we are not prepared to hold him negligent in not discrediting the secretary's statement, and proceeding to investigate the assumption of the debt by Olson.

The foregoing is all that seems to be necessary in consideration of the defendant's appeal, upon which, therefore, we find no error prejudicial to it, and should affirm the judgment, if only that appeal were before us.

2. Turning now to the plaintiff's appeal, which is from the allowance of damages against him upon the overdraft of the secretary, Lund, we must deem it sufficient to say that the finding of the trial court that plaintiff was guilty of negligence in failing to discover and thus in permitting the secretary to withdraw funds of the company in excess of his salary, through a period of some seven years—the secretary being pecuniarily irresponsible, though of excellent reputation and apparently economical habits—is supported by the evidence. We should not sustain the view that one occupying the position of general manager must at all times be cognizant with the condition of every account upon the books, even

though they were kept by immediate subordinates of his— less so where kept under the control of an officer having such measure of independence as the secretary had in this case; but one who is charged with the care of a business of this magnitude certainly owes, as a mere measure of ordinary diligence, the duty of some supervision, to see that others having access to its funds are not misappropriating them. Just what acts may constitute fulfillment or breach of that duty, it is unnecessary now to decide. We think it within the judgment of a trial court, in drawing inferences of fact, to hold that the ordinarily diligent man, in plaintiff's position, would have discovered the depletion of its funds long before the plaintiff did. It may reasonably be supposed, too, that, if that discovery had been made while the overdraft was comparatively trifling in amount, reimbursement by the secretary out of his salary might have been possible. When the discovery was made, the amount of the deficiency rendered such result improbable. Hence we cannot say that the court was wrong in concluding that the whole amount of Lund's overdraft at the time of its discovery, in 1897, might properly be held to be damage resulting from plaintiff's neglect to discover it in proper time, and take effective steps to prevent its increase and secure its repayment. As to the period of five months between the discovery of this overdraft, in September, 1897, and the final discharge of Lund, in February, 1898, during which period the overdraft increased some $300, we have more doubt. Whether it was not consistent with ordinary prudence and diligence to make the experiment whether Lund might not reform his expenditure, and gradually reduce his indebtedness to the company, and, in promotion of such hope, to refrain from blasting his reputation and destroying the confidence of the directors in him, might at least be open to different opinions. But here, again, after careful review of the situation, we have come to the conclusion that the finding must stand, and the plaintiff be held negligent in thus giving

to a known defaulter the opportunity to take to himself further moneys of the corporation, whereby resulted this additional loss. We therefore conclude that the amounts actually drawn by Lund from the treasury of the company, and entered upon its books, up to the time of his discharge, were properly held to be damages resulting from the negligence of the plaintiff, and for which he must respond, as also for the interest thereon.

At this point, however, we come in contact with a peculiar item, of $409.70, entered upon the books by Lund on the day of his discharge, the items composing which are not in evidence, but are stated to be a number of turned accounts, where Lund had receipted the accounts of debtors to the company in consideration of the discharge of his own indebtedness to such debtors. These he had never entered upon the books, and of them plaintiff never had any knowledge, nor, so far as the evidence goes, information of any fact to put him upon inquiry. We find ourselves unable to discover anything of negligence on plaintiff's part to which can be ascribed the fact that these particular accounts were lost to the company, if they were lost. Such transactions were in no way called to his attention by any entry within his reach. They transpired wholly between Lund and the outside parties. Only by accident would any one of them be likely to come to plaintiff's knowledge. To impute such knowledge to him would be to charge him with a duty of omniscience. Further, however, there is no proof of damage to the defendant. The evidence does not disclose when these transactions took place, nor that the several debtors were not, even up to the time of the commencement of the present action, wholly solvent; neither does it disclose that the indebtedness of any of them to the defendant had become barred by the statute of limitations. It hardly needs to be stated that such transactions as those of Lund with debtors of the corporation could have no possible effect in discharging their debts to it. The

very fact that they gave as consideration only a cancellation of Lund's personal liabilities to them charged them in the fullest manner with notice of his breach of duty as an agent, and they remained, as before, the debtors of the corporation. *Commercial Bank v. Ten Eyck,* 48 N. Y. 305; *Remington v. E. R. Co.* 109 Wis. 154, 163, 84 N. W. 898, 85 N. W. 321. We are convinced that there is no evidence to warrant the conclusion of law that the plaintiff is liable for this part of the recovery awarded against him.

Another item included in the so-called Lund overdraft is a charge of $145.79 on turning account with one Dow, made not until January 10, 1899. At that time Dow appeared as a debtor on account to the defendant, and an unexplained entry was then made, charging the above amount to Lund. There is not the slightest evidence to show that Dow parted with any consideration or changed his position in any way by reason of such book entry, or that it was made in pursuance of any agreement with him to which plaintiff was a party. No reasonable explanation is made by defendant of any theory on which it can be claimed that defendant lost anything thereby, and we find ourselves unable to discover any evidence to warrant the conclusion that Dow was any less liable to defendant after than before such entry, nor, if he is, how the plaintiff's acts have aided to that result. This item was erroneously included in the damages allowed.

Another error, obviously clerical, has attracted our notice, which, although not mentioned by counsel, is covered by the general language of both an exception and an assignment of error, so that we must correct it. It consists in adopting as the increase of Lund's overdraft between September 1, 1897, and February 8, 1898, the sum of $921.25, while the true increase was only $710.77, even including the turned accounts. This resulted from deducting an interest charge of $210.48 from the ledger balance of September 1, 1897, to get the true amount of overdraft to that time, and in omitting

to make the same deduction from the ledger balance of February 8, 1898, when that of September 1st was compared with it to ascertain the increase.

From the foregoing, it results that the judgment is erroneous, to the prejudice of plaintiff, in the sum of the above-mentioned improper allowances, plus the interest thereon as included in the judgment. Deduction must therefore be made from the allowance on counterclaim as follows, as of the date of the findings, June 11, 1902:

| | |
|---|---|
| Turned-accounts item | $409 70 |
| Clerical error | 210 48 |
| Interest on both, February 8, 1898, to June 11, 1902 | 161 55 |
| Robe Dow account, with interest as in findings | 175 75 |
| Total deductions | $957 48 |

This deducted from the $4,510.83 awarded defendant on its counterclaim leaves as the true allowance, $3,553.35, which, being set off against the $3,630.77 allowed on plaintiff's cause of action, results in a balance of $77.02, for which, with interest from June 11, 1902, plaintiff should have judgment against defendant.

*By the Court.*—On plaintiff's appeal the judgment is reversed, and cause remanded with directions to enter judgment in plaintiff's favor for seventy-seven and $\frac{02}{100}$ dollars ($77.02), with interest from June 11, 1902, and for his costs. Defendant will take nothing on its appeal.

SIEBECKER, J., took no part.