CAPEN WHOLESALE, INC., Plaintiff-Respondent,

v.

John F. PROBST, Defendant-Appellant,

J.F. PROBST & COMPANY, INC. and John G. Probst,
Defendants.

Court of Appeals

*No. 92–0306. Submitted on briefs January 6, 1993.—Decided
November 23, 1993.*

(Also reported in 509 N.W.2d 120.)

354

For the defendant-appellant the cause was submitted on the briefs of *Tilg & Koch, Ltd.*, with *Thomas M. Foy*, of counsel, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *Burton A. Strnad, S.C.*, with *Burton A. Strnad*, of counsel, of Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

SCHUDSON, J.   John F. Probst (Probst Senior) appeals from a judgment following a bench trial in

which he was found liable for civil theft by contractor, in violation of sec. 779.02(5), Stats. He argues that although he was a corporate officer and director, he was not "responsible for the misappropriation" under sec. 779.02(5). Because, as the trial court found, Probst Senior "had the power and authority to direct the proper payment of the corporation's funds," we conclude that he was "responsible for the misappropriation" and liable for theft by contractor. Therefore, we affirm.

## I.  BACKGROUND

Capen Wholesale, Inc. (Capen), supplied roofing materials to J.F. Probst and Company, Inc. (the Corporation), a building contractor involved in various construction projects. Probst Senior was the founder of the Corporation and, at all times relevant to this appeal, he was a corporate officer, director, and owner of sixty-five percent of the corporation's common stock. His son, John G. Probst (Probst Junior), also was a corporate officer and director, and he owned thirty-five percent of the Corporation's common stock. On about January 28, 1988, however, Probst Junior sent Probst Senior a letter of resignation indicating that he (Probst Junior) would no longer be acting as an officer or director.

In 1989, Capen filed a complaint alleging that Probst Senior and Probst Junior had committed civil theft by contractor, in violation of sec. 779.02(5), Stats. [1] Capen's complaint alleged that between October 1987

---

[1] Capen also named the Corporation, the wife of one of the defendants, and a bank as defendants in the complaint. Prior to trial, however, they were dismissed from the action and the case then was tried between Capen and the defendants, Probst Senior and Probst Junior.

and February 1988, Capen delivered materials to the Corporation but never received payment, even though the Corporation used those materials on construction projects for which the Corporation received full payment.

Trial took place on March 4 and March 5, 1991. On November 22, 1991, the trial court issued written findings of fact and conclusions of law, stating that Probst Senior and Probst Junior were jointly liable to Capen for $28,578.95, plus costs and disbursements of $6,447.70, for a total judgment of $35,026.65. Judgment was entered on December 23, 1991. Probst Junior did not appeal. Probst Senior appeals, challenging the trial court's conclusion regarding his liability.

## II. DECISION OF THE TRIAL COURT

Probst Senior does not dispute the trial court's factual findings. Accordingly, we recite the findings relevant to the issues he presents:

> Plaintiff Capen Wholesale, Inc. (Capen) is a corporation engaged in the sale of roofing materials. Defendant J. F. Probst & Co., Inc. (the Corporation) was engaged in business as a roofing contractor.
>
> Defendant John F. Probst (Probst Senior), the founder of the Corporation, owned 65 percent of the Corporation's common stock. At all times material to this action, Probst Senior was an officer and director of the Corporation. Probst Senior ran the Corporation from its inception until the early 1980s, when he moved to Florida, but he retained his positions as officer and director and as majority shareholder. In addition, Probst Senior resided in Wisconsin five months a year, during which time he spent one day a week at the Corporation's office.
>
> Defendant John G. Probst (Probst Junior) is the owner of 35 percent of the Corporation's com-

358

mon stock and was an officer and director of the Corporation. Probst Junior ran the Corporation since the early 1980s. On or about January 28, 1988, he sent a letter of resignation to Probst Senior indicating he would no longer be acting as officer or director.

According to . . . the Corporation's bookkeeper, all money received by the Corporation was commingled into one bank account from which all corporate expenses were paid as they arose[:] . . . first . . . payroll, then rent and utilities, then taxes and then suppliers and materialmen. This practice had been established when Probst Senior actively managed the Corporation and had continued throughout the Corporation's existence.

Capen sold the Corporation materials to be used for improvements to the property of third parties and the materials were so used. The property owners paid the Corporation for the work, but Capen never received payment in return.

. . . .

Although Probst Junior sent Probst Senior a letter of resignation, Probst Junior's conduct after that time supports the conclusion that he remained in control of the Corporation. It is significant that he continued to receive a salary at the same rate of compensation, he collected accounts receivable, and generally supervised corporate operations. Probst Junior remained in the office on a daily basis and the bookkeeper continued to look to him for direction. . . .

The trust funds were misappropriated during the ordinary course of the Corporation's business as money from the trust funds was drawn to pay other corporate expenses. . . . Moreover, before resigning, Probst Junior took no action to ensure that the materialmen would be paid as required by statute despite his knowledge that the procedures being

359

followed would result in payment of other corporate expenses before those due to materialmen.

. . . .

Probst Senior, although not active in managing the day-to-day affairs of the Corporation, remained a director, officer, and majority shareholder. The bookkeeper's testimony was undisputed that the Corporation collected payments and paid expenses in the same manner as when Probst Senior had been actively involved in its operation. Neither Probst Junior nor Probst Senior as officers and directors ever developed appropriate business practices or procedures to protect the trust funds belonging to their suppliers.

When notified of Probst Junior's resignation, Probst Senior chose to do nothing. He remained inactive for almost a month, during which time the trust funds owed to Capen were misappropriated. . . .

The trial court concluded:

Probst Junior, by not directing that the funds be maintained in accordance with the statutory requirements, acted in breach of his fiduciary duty and thus is responsible for the misappropriation of the trust funds. Probst Junior's resignation letter does not alter his liability because he continued to perform duties in the capacity as an officer and director. . . .

. . . .

. . . Probst Junior is liable to Capen as an officer and director of the Corporation. . . .

. . . .

. . . By virtue of his positions as officer and director, Probst Senior had an affirmative duty to protect the corporate funds and insure that the proper parties were paid. Probst Senior is responsible by his inaction and his failure to ensure that the

affairs of the Corporation were being properly managed. . . .

. . . .

Both Probst Senior and Probst Junior had the power and authority to direct the proper payment of the Corporation's funds. As officers and directors they each had the duty to exercise adequate supervision to ensure proper payment. Neither did so and thus in accordance with the provisions of § 779.02(5) are liable to plaintiff in the amount so misappropriated.

Probst Senior offers two theories in support of his appeal. He contends that the trial court erred in finding him liable for theft by contractor "merely by virtue of his status as an officer/director of the Corporation . . . in the absence of any evidence that he received any of the moneys or that he personally misapplied any of the moneys." He also argues that the trial court erred in basing his liability on "omissions by a corporate officer/director as opposed to affirmative acts of misappropriation by corporate officers/directors. . . ."

## III.   STANDARD OF REVIEW

Whether an officer/director can be "responsible for the misappropriation" under sec. 779.02(5), Stats., without having received any of the misappropriated moneys, and whether an officer/director can be "responsible for the misappropriation" by virtue of what, Probst Senior argues, were mere acts of omission, present questions of law, which we determine without deference to the trial court. *See W.H. Major & Sons, Inc. v. Krueger*, 124 Wis. 2d 284, 296, 369 N.W.2d 400, 406 (Ct. App. 1985) (application of sec. 779.02(5) to facts of case presents a question of law). In this case,

however, because the trial court's legal conclusion was "intertwined with the factual findings," we "should give weight to the trial court's decision, although the trial court's decision is not controlling." *See Wassenaar v. Panos*, 111 Wis. 2d 518, 525, 331 N.W.2d 357, 361 (1983).

█

In this case the trial court's legal conclusion was "intertwined with" a critical factual inference: Probst Senior "had the power and authority to direct the proper payment of the Corporation's funds." Significantly for both his theories on appeal, although Probst Senior characterizes the trial court's conclusion as one based "merely" on his "status" and "omissions," he does not challenge this important factual inference that formed the basis for the trial court's legal conclusion.[2] Thus, in this case where the "responsibility" of a corporate officer/director is at issue, we review the trial court's *legal* conclusion *de novo*, but not without "giv[ing] weight to the trial court's decision," *id.*, that was based on the unchallenged factual inference that Probst Senior had "the power and authority to direct the proper payment."

## IV. DISCUSSION

As the trial court explained, sec. 779.02(5), Stats., "establishes a trust fund in favor of a materialman of

---

[2] Nor is there any basis in this record on which we would disturb the trial court's factual inference. "The drawing of an inference on undisputed facts when more than one inference is possible is a finding of fact which is binding upon the appellate court. It is not within the province of . . . any appellate court to choose not to accept an inference drawn by a factfinder when the inference drawn is a reasonable one." *State v. Friday*, 147 Wis. 2d 359, 370-71, 434 N.W.2d 85, 89 (1989).

monies paid by an owner to the contractor for the payment of claims due for labor and materials to persons entitled to a lien by law against said owner or his property." The statute states, in relevant part:

> [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid. . . . The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims. . . have been paid in full . . . is theft by the prime contractor or subcontractor of moneys so misappropriated. . . . *If the prime contractor or subcontractor is a corporation, such misappropriation shall also be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation.*

Section 779.02(5), Stats., (emphasis added).

Here, there is no dispute that all the elements of theft by contractor were established: Capen supplied materials to the Corporation; the Corporation used Capen's materials on its construction projects; the Corporation's customers paid for the construction projects; the Corporation did not pay Capen; and the Corporation used the moneys in "trust" for purposes other than paying Capen. The only issue, therefore, is whether, under sec. 779.02(5), Stats., Probst Senior was "responsible for the misappropriation."

## A. "Personal" Misappropriation

Probst Senior contends that the trial court found him "personally liable . . . only because of his status as

an officer/director. . . ." He argues that "in the absence of any evidence that he received any of the moneys or that he personally misapplied the moneys," he cannot be "personally liable to . . . Capen for misappropriated trust funds moneys" under sec. 779.02(5), Stats. He is incorrect.

Clearly, sec. 779.02(5), Stats., precludes the interpretation Probst Senior seeks. Specifying that "[t]he use of any such moneys . . . *for any other purpose* [than paying the subcontractors] . . . is theft by . . . contractor," the statute perforce anticipates situations in which the person "responsible for" the misappropriation directs or allows the misappropriated trust moneys to produce corporate or other benefits, rather than personal gain. Any lingering doubt was erased by *Weather-Tite Co. v. Lepper*, 25 Wis. 2d 70, 130 N.W.2d 198 (1964) (defendant personally liable to plaintiff for amount of plaintiff's claim where defendant expended trust funds for ordinary business expenses instead of the payment of claims as provided in the theft by contractor statute), and, more elaborately, by *Burmeister Woodwork Co. v. Friedel*, 65 Wis. 2d 293, 222 N.W.2d 647 (1974), where the supreme court clarified that there is "no requirement that the corporate officer responsible for the misappropriation of the funds must receive a benefit from his acts before he may be held personally liable." *Burmeister*, 65 Wis. 2d at 298, 222 N.W.2d at 650.

Probst Senior maintains that this case is not controlled by *Weather-Tite* and *Burmeister* because his circumstances are distinguishable from those considered in each of those cases. He says that he received no financial benefit from the misappropriation whereas, by contrast, he argues that the officer in *Weather-Tite* "*personally* received the trust fund moneys . . . and then

personally applied the moneys toward the payment of other corporate debts. . . ." Probst Senior also contends that he was uninvolved in the Corporation while, by contrast, he argues that the corporate officer in *Burmeister* "was *directly* responsible for misapplying and thus misappropriating the moneys. . . . [and] presided over *all* of the corporate decision making. . . ."

Probst Senior's argument, however, fails to recognize that in both *Weather-Tite* and *Burmeister*, the supreme court concluded that the corporate officers were personally liable not on the basis of whether the officers received financial gain, but rather, on the basis of how the trust funds were *not* used. Responding to an argument similar to Probst Senior's, the court in *Burmeister* declared:

> The defendant here attempts to distinguish *Weather-Tite* on the grounds that the defendant in that case received a benefit because he was [the corporation's] salaried president and he received some of the misappropriated funds in the form of his salary. The decision, however, makes no mention of [the president] receiving a salary or that the misappropriated funds were used to pay that salary. The funds were used for the ordinary and normal expenses of the business. *The only important point is that they were used for purposes other than the payment of claims as provided in the statute.*

*Burmeister*, 65 Wis. 2d at 298, 222 N.W.2d at 650 (emphasis added). Therefore, we conclude that, under sec. 779.02(5), Stats., Probst Senior can be "responsible for the misappropriation" even if he received no personal benefit from the misapplied moneys.

## B. Acts of Omission/Acts of Commission

Probst Senior also contends that the "trial court imposed personal liability here on an officer/director who during the time in question was inactive and who had in fact retired to Florida." He argues, therefore, that the trial court erred in finding him "responsible for the misappropriation" by virtue of *omissions*, as opposed to affirmative acts of misappropriation. His argument misconstrues the trial court's conclusion.

The trial court found that Probst Senior's responsibility derived from acts of commission as well as omission. Most critically, the trial court found four interconnected facts that established his responsibility:

- The comminglings of all moneys and the pay-out process were procedures "established when Probst Senior actively managed the corporation. . . ."

- Consistent with those procedures, "trust funds were misappropriated during the ordinary course of the Corporation's business as money from the trust funds was drawn to pay other corporate expenses."

- Even during Probst Senior's retirement, he retained his corporate positions, spent one day a week at the corporate office during his five months a year residence in Wisconsin, and did nothing to alter the faulty procedures that allowed for misappropriation.

- During the time when Probst Junior attempted to abdicate his responsibility, including the month when the trust funds owed to Capen were misappropriated, "Probst

Senior chose to do nothing," thus allowing the misappropriation to take place. [3]

Probst Senior implicitly argues, however, that his acts of commission were in the distant past and that, therefore, the trial court still erroneously based his liability on nothing more than acts of omission. Once again, Probst Senior's argument misconstrues the trial court's factual findings and misinterprets the law.

Although Probst Senior would have us view his actions as remote, the trial court reasonably found otherwise. First, the trial court found that Probst Senior, as corporate director and controlling stockholder, acted continuously throughout the period that ultimately produced the misappropriation — from instituting the pay-out procedures years before; to maintaining his seasonal, weekly presence and participation for many years during which those pay-out procedures continued; through allowing the misappropriation to take place, pursuant to those very pay-out procedures. Second, the trial court found that Probst Senior "chose to do nothing" to prevent the misappropriation, despite his authority to act to prevent it.

Moreover, since at least the beginning of this century, it has been possible for a corporate officer or director to be liable to a corporate creditor for both "misfeasance and nonfeasance." *See Michelson v. Pierce,* 107 Wis. 85, 87, 82 N.W. 707, 708 (1900). *Michelson*, however, focused on such liability within the

[3] There also was conflicting evidence regarding whether, during this period, Probst Senior acted to allow a bank to exercise its right of set-off. The trial court, however, did not make any factual finding in this disputed area and did not base its decision on this alleged action.

context of the fiduciary relationship between a director and stockholder in a dissolution action. Since *Michelson*, our courts rarely have revisited the question of whether "nonfeasance" can result in a corporate officer/director's personal liability,[4] and have not done so in the context of theft by contractor.

Other jurisdictions, however, in a variety of contexts, have considered analagous issues and articulated principles that, we conclude, are sound and equally applicable to this case. They explain that even if a corporate officer/director does not participate, directly or indirectly, in misappropriation, civil liability still may come about if the officer/director has "knowledge amounting to acquiescence." *See New England Box Co. v. Gilbert*, 123 A.2d 833, 835 (N.H. 1956); *Taylor v. Alston*, 447 P.2d 523, 524 (N.M. Ct. App. 1968). The "knowledge amounting to acquiescence" standard also has been articulated by Knepper and Bailey:

> ### § 5.03.   *Liability for conversion of property of others.*
>
> When a corporation converts property belonging to third persons to its own use, there is some authority that directors or officers of the corporation may be held personally liable for their negligence which directly causes or contributes to such conversion. For such liability to exist, the directors or officers must participate in the transac-

---

[4] *See Johnson v. Stoughton Wagon Co.*, 118 Wis. 438, 95 N.W. 394 (1903); Cf. *State v. Rollfink*, 162 Wis. 2d 121, 475 N.W.2d 575 (1991) (personal liability imposed on corporate officer, who although not directly involved in any wrongdoing, was "an operator" *"responsible for the operation"* of the facility that violated the hazardous waste law).

tion or *have knowledge amounting to acquiescence*, or they must be guilty of negligence in the management of the corporate affairs causing or contributing to the conversion.

WILLIAM E. KNEPPER & DAN A. BAILEY, LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 5.03 at 164 (4th ed. 1988) (emphasis added). Further, in circumstances involving corporate misappropriation of moneys in trust, an officer/director must not be allowed "to escape responsibility . . . by preserving a state of ignorance through a gross or willful neglect of duties." *Preston-Thomas Constr., Inc. v. Central Leasing Corp.*, 518 P.2d 1125, 1127 (Okla. Ct. App. 1973).

Thus, when Probst Senior argues that "doing nothing" is an omission for which he cannot be held liable, he pursues a theory at odds with *Michelson* and and subsequent authorities. Although, in theory, a corporate officer might be observed to "do nothing" under circumstances that suggest lack of knowledge, involvement, or authority, another corporate officer might *choose* to "do nothing" despite having knowledge of and authority to prevent unlawful practices. Therefore, we reject Probst Senior's argument that "misappropriation" necessarily "connotes an affirmative act" and "does not encompass inaction or the failure to act. . . ."

Here, the trial court's conclusion that Probst Senior was "responsible by his inaction" flowed from its finding of "his failure to ensure that the affairs of the Corporation were being properly managed"—a failure to ensure something he had the "power and authority" to ensure. Thus, we conclude that Probst Senior's acts

of omission as well as commission rendered him "responsible for the misappropriation."[5]

*By the Court.*—Judgment affirmed.

FINE, J. (*concurring*). The issue here is whether John F. Probst is liable under section 779.02(5), Stats., for the diversion of funds held in trust by the J.F. Probst & Company for its subcontractors. I agree with the majority's conclusion that he is, but for the following reasons.

Chapter 779 of the Wisconsin Statutes reflects the legislature's reification of common-law principles

---

[5] Probst Senior also challenges the trial court's determination that $5,460.49 in prejudgment interest was properly added to the judgment. Probst Senior contends that Capen's damages were not " 'fixed and determinate,' " despite the parties' stipulation at trial that of the money Probst Corporation received, $28,578.95 was owed to Capen. In support of his argument, Probst Senior points to Capen's post-trial brief where Capen argued that Probst Junior and Probst Senior were both jointly and severally liable for the full $28,578.95, but that in any event Probst Junior and Probst Senior should definitely be jointly and severally liable for $21,353 (representing the Capen trust funds received after Probst Junior's resignation). In the trial court's written decision, however, the trial court found that Capen never received any portion of the $28,578.95 it was owed and concluded that Probst Junior and Probst Senior were both jointly and severally liable for the full $28,578.95.

"Preverdict interest is available when damages are fixed and determinable or may be measured according to a reasonably certain standard," a question of law we determine *de novo*. *Loehrke v. Wanta Builders*, 151 Wis. 2d 695, 706, 445 N.W.2d 717, 722 (Ct. App. 1989). Here, it was undisputed that Capen was owed $28,578.95, therefore, Capen's damages were "fixed and determinable" and the preverdict interest award was appropriate.

designed to protect those who supply material and services. The theft-by-contractor provisions of chapter 779 accomplish this protection by imposing trust-fund status on money paid for contracted-for improvements. *See* secs. 779.02(5) & 779.16, Stats. Section 779.02(5), Stats., provides that a diversion of trust funds by a corporate contractor "also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation."[1]

John F. Probst was, during the times material to this action, an officer and director of J.F. Probst & Company. He also was the company's majority shareholder, owning sixty-five percent of its stock. He contends that he is not "responsible for the misappropriation" because at the time of the diversion he was essentially retired despite his positions with the company, and did not personally divert or misappropriate the trust-fund money.

The general rule is, of course, that corporate shareholders, directors, or officers are not personally liable for the acts of the corporation. This rule, however, is not inviolate. Thus, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, a director or officer can be liable for clean-up costs as an "owner or operator," 42 U.S.C. §§ 9601(20)(A), 9607(a)(1) and (2), of a corporate-owned facility that disposed hazardous substances, as long as that person had authority to affect the disposal operations, even though he or she did not actively participate in those operations. *Nurad, Inc. v. William E. Hooper &*

---

[1] Diversion of money thus held in trust is a defalcation under section 523(a)(4) of the Bankruptcy Code, 11 U.S.C. § 523 (a)(4), and is, therefore, non-dischargeable in bankruptcy. *In re Thomas*, 729 F.2d 502 (7th Cir. 1984) (trust fund under section 779.16).

*Sons Co.*, 966 F.2d 837, 842-844 (4th Cir. 1992), *cert. denied*, 113 S. Ct. 377. This is consistent with Wisconsin law. As the majority opinion points out in footnote 4, the Wisconsin Supreme Court has recognized that an individual "need not personally authorize, participate in, or supervise violations of [the laws regulating hazardous wastes] in order to be responsible for the overall operation of a hazardous waste facility." *State v. Rollfink*, 162 Wis. 2d 121, 135, 475 N.W.2d 575, 580 (1991). Rather, it is sufficient if he or she has authority over the operation. *Id.*, 162 Wis. 2d at 137, 475 N.W.2d at 581. In my view these principles are equally applicable here.

As a director of J.F. Probst & Company, John F. Probst was responsible for the "business and affairs" of the company. *See* sec. 180.0801(2), Stats. There is a split among those courts that have considered whether a corporate director is liable to third-persons for his or her negligence in fulfilling a director's responsibility to ensure that the corporation does not convert funds belonging to others. *See* Annotation, *Liability of Corporate Directors or Officers for Negligence in Permitting Conversion of Property of Third Persons by Corporation*, 29 A.L.R.3d 660 (1970). Although there are no Wisconsin cases directly on point, I believe that Wisconsin's strong interest in protecting persons who supply material and services tips the scale in favor of the rationale employed in the environmental cases so that a corporate director, at least in the context of the closely-held corporation we have here, is a "responsible" person under section 779.02(5), Stats., even though he or she might not have directly participated in the misappropriation of funds held in trust by virtue of that section. *Cf. Bowerman v. Hamner*, 250 U.S. 504, 513 (1919) (Under common-law principles, a director

"cannot be shielded from liability because of want of knowledge of wrongdoing on his part, [if] that ignorance was the result of gross inattention in the discharge of his voluntarily assumed and sworn duty" as a director.) (action by receiver against director of a national bank that failed). Accordingly, I concur.