STATE of Wisconsin, Plaintiff-Respondent,

v.

Angela A. KEYES, Defendant-Appellant-Petitioner.

STATE of Wisconsin, Plaintiff-Respondent,

v.

Matthew E. KEYES,
Defendant-Appellant-Petitioner.

Supreme Court

*Nos. 2004AP1104–CR, 2004AP1105–CR.*
*Oral argument March 4, 2008.—Decided June 3, 2008.*

2008 WI 54

(Also reported in 750 N.W.2d 30.)

For the defendant-appellant-petitioner there were briefs by *Michael J. Devanie* and *Devanie & Belzer, S.C.*, La Crosse, and oral argument by *Michael J. Devanie.*

For the plaintiff-respondent the cause was argued by *Maura F.J. Whelan,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *William E. McCardell, Chad R. Gendreau,* and *DeWitt Ross & Stevens S.C.,* Madison, on behalf of the Associated General Contractors of Wisconsin, Inc., the Associated General Contractors of Greater Milwaukee, Inc., and the Associated Builders and Contractors of Wisconsin, Inc., and there was oral argument by *William E. McCardell.*

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Angela and Matthew Keyes, seek review of a published court of appeals decision affirming a circuit court order denying a motion to dismiss their bindover and information.[1] The Keyes were each charged with felony theft by contractor, party to a crime, in violation of Wis. Stat. §§ 779.02(5) and 943.20(1)(b) (1999–2000).[2] The charges stemmed from payments they received on a

_____

[1] *See State v. Keyes,* 2007 WI App 163, 304 Wis. 2d 372, 736 N.W.2d 904 (affirming order of the circuit court for La Crosse County, Michael J. McAlpine, Judge). Both the motion to dismiss the bindover and the motion to dismiss the information were based on the alleged insufficiency of evidence presented at the preliminary hearing to support the bindover.

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

The court of appeals noted that "[a]lthough the 'felony theft by contractor' criminal charge against the Keyeses also includes the intent element of Wis. Stat. § 943.20(1)(b), the felony element of § 943.20(3)(c), and the 'party to a crime' element of Wis. Stat. § 939.05, we will at times refer to the statutes collectively as Wis. Stat. § 779.02(5)." *Keyes,* 304 Wis. 2d 372, ¶ 9 n.4. We shall do likewise.

Wisconsin Stat. § 943.20 is Wisconsin's theft statute. The court of appeals and the parties refer to the 2001–02 version of

519

house construction project for which they were prime contractors.

¶ 2.  The Keyes maintain that the court of appeals erred when it concluded that the circuit court properly found probable cause to believe that the Keyes violated the theft by contractor statute, Wis. Stat. § 779.02(5). They assert that payments made to Angela Keyes were for her legitimate claims as a subcontractor and that the payments were not "used for any other purpose." They further contend that the State failed to present sufficient evidence to support the bindover as to whether there were unpaid claims to subcontractors due at the time Angela received the payments.

¶ 3.  Based upon the language of § 779.02(5) and its purpose, we agree with the court of appeals that the circuit court's finding of probable cause was based on a proper interpretation of the statute. However, we disagree with the court of appeals to the extent that its decision implies that contractors or subcontractors may not receive profit on a project until the project ends. We further conclude that the State presented sufficient evidence at the preliminary hearing to support the bindover. Accordingly, we affirm the decision of the court of appeals.

I

¶ 4.  The defendants were each charged with felony violation of the theft by contractor statute, Wis.

the Wisconsin Statutes. The Keyes were charged with a Class C felony pursuant to Wis. Stat. § 943.20(3)(c) (1999–2000), which requires that the amount of property at issue exceed $2500. The Wisconsin legislature revised the statute in 2001 such that §§ 943.20(3)(bf), (bm), and (c) are different classes of felony based on the amount of property at issue. 2001 Wis. Act 109, § 146. The changes do not affect our analysis.

Stat. § 779.02(5). The criminal complaints alleged that the defendants were trustees over moneys paid for improvements on land and "intentionally retain[ed] possession of such money without the owner's consent, contrary to [their] authority, and with intent to convert to [their] own use . . . ."

¶ 5. In December 2001, James and Rose Wettstein entered into a contract to build a home with general contractors Angela and Matthew Keyes, who were doing business as Keyes to Design, Inc. The parties agreed to a contract price of $2500 for pre-construction services and $37,500 for construction services plus the cost of the work. In addition, the contract provided that Matthew Keyes would receive $50 per hour for labor. The first estimate of construction cost was $467,723. A series of change orders increased the estimate to $492,204. The parties signed a notice to proceed in March 2002.

¶ 6. The project was financed through a bank construction loan administered by The Title Company. The money was to be paid in a series of draws. Between June 4, 2002, and November 19, 2002, the Keyes took seven draws from the Wettsteins' loan account, totaling $417,647. Lien releases filed by subcontractors indicated that $219,155.43 had been paid to subcontractors. In August 2002, while the home was being constructed, the Wettsteins became suspicious when they learned that some subcontractors on the project were not being paid and that Angela Keyes was doing some of the contracting work herself.

¶ 7. Ultimately, The Title Company denied the Keyes' request for an eighth draw. In addition, the Wettsteins asked Linda Jones, a certified public accountant, to investigate project finances. Based on Jones's investigation, the Wettsteins filed a complaint with the

Onalaska Police Department. A criminal complaint against the Keyes for felony theft by contractor pursuant to Wis. Stat. §§ 779.02 and 943.20 followed in January 2003.

¶ 8. According to the criminal complaint, the investigator reviewed paperwork provided by Jones showing that Angela Keyes had paid herself $75,000 for materials, with approximately $35,000 of that amount unaccounted for. The investigator was also informed that Matthew Keyes took out a contractor fee of $35,875 at one time, and when James Wettstein inquired about the entire amount being withdrawn at once, Matthew stated, "[y]ou bet. I took it all out when I thought you were going to pull the plug."

¶ 9. The criminal complaint also described billing discrepancies. Based on her log of time she spent at the house, Rose Wettstein told the investigator that Matthew Keyes billed 9.5 hours of work for days she knew he was not at the house. Further, the complaint recounted Jones's explanation to the investigator that she traced money from the Wettsteins' construction account and found it being used for purposes other than the Wettstein project. Those uses included making payments on other jobs, paying off loans not related to the Wettstein project, and making payments into personal accounts. The criminal complaint stated that Jones had determined that money had been:

> used for other purposes such as paying other jobs, payments to Coulee State Bank for loan payments, cash in the amount of $17,286.48 and deposits into their personal accounts in the amount of $31,018.58, including a $3,000 check to Dahl Ford. . . . there were obvious payments being made from the Wettstein draws that should have been going towards the house being turned into cashier's checks and being used for other purposes.

¶ 10.  The State presented two witnesses at the preliminary hearing, James Wettstein and Linda Jones. The Keyes presented none. James Wettstein testified regarding the building contract, the construction loan, and project budgets. He stated that he had agreed to a budget that included estimated costs for various aspects of the project, including materials. He further testified that he had consulted with both Angela and Matthew Keyes regarding proposals for the provision of materials, and that the parties had agreed to several change orders that revised the original budget. Specifically, James Wettstein agreed that he had discussed with Angela Keyes what type of carpeting, cabinets, tile, and countertops to purchase.

¶ 11.   Jones's testimony was based on her examination of documents relating to the project, including draw requests, checks, lien waivers, and invoices, as well as documents from the Keyes, including bank records obtained by subpoena. She testified that as of December 2002, the Keyes had received approximately $417,000 in draws from the construction account. Of that money, Jones testified that the Keyes made payments of approximately $317,000 to subcontractors and suppliers from the draws. The remaining money, approximately $100,000, was used for a variety of purposes, including loan payments and general business expenses:

> [T]here was some $8,000.00 made—payments on loans to Coulee State Bank. There was a $3,000.00 check that was written out to Dahl Ford. There was some other—60 some thousand dollars that was paid for just general business expenses like telephone or utilities. They paid themselves rent . . . .
>
> There was a substantial amount of money paid on previous jobs, some vendors that were not even used on

the Wettstein job, ... credit card payments, a lot of
credit card payments ..., sales tax, tax liens, that type
of items ....

¶ 12.  Her analysis of the information revealed
that $30,750 had been paid for Matthew Keyes' labor
and $33,375 had been paid to the Keyes as a contractor
fee. In addition, Jones found invoices for $75,241.12
paid to Angela Keyes. She was able to account for some
of the money invoiced to Angela Keyes as having been
paid to third parties for materials. However, Jones was
unable to account for $36,036.28 of the payments made
to Angela Keyes. According to Jones, there also re-
mained approximately $47,000 in unpaid bills and
invoices submitted by subcontractors.

¶ 13.  During cross-examination, Jones stated that
she did not include in her analysis several proposals for
materials prepared by Angela Keyes on the grounds
that there were no receipts verifying the amounts
contained in the proposals. Similarly, Jones testified
that she did not include invoices supplied by Angela
Keyes in her calculations of the accounted for sums. She
stated that she considered the invoices "bogus."

¶ 14.  According to Jones, Angela Keyes received
cashier's checks for the balance of money left from
draws and then created invoices to match that amount.

When I look at the—what their practice was, to take
the draw and convert it into a cashier check and then
out of the cashier check—and that cashier check was
made out to them, to Keyes to Design, Inc.; and then a
day or so later ... they would go back to the bank and
redeem that cashier check for a series of other checks
and some checks were made out to the subcontractors
and then another check would be made out to [the

524

Keyes] for the balance, and it just so happened that there's ... an invoice that happens to match that cashier's check.

Jones further testified that Angela Keyes had been "recycling" money by using cashier's checks to conceal what she was doing:

But then that cashier's check would be turned in and redeemed and another payment or they might ... put some money into their checking account out of that cashier check and another cashier's check was made out to them and there's another invoice that would happen to match that cashier's check. So she's creating an invoice to match a cashier check, she's not paying herself with new moneys. She's paying herself out of that first moneys that she's gotten. So they're just like recycling money or generating invoices to match a cashier check so she could say that she was entitled to this money.

The Keyes' attorney asked whether Jones' testimony was "saying they stole the money and used it to pay other jobs or anything?" Jones responded that she thought they had done so.

¶ 15. In addition to determining that there were $36,036.28 in unaccounted for payments made to Angela Keyes, Jones indicated that she was dubious as to whether Matthew Keyes was entitled to the entire amount paid for labor:

Jones:  I have also—after reviewing the labor records that were turned in have a lot of questions as to how much of the labor actually he was entitled to of that 30,000.

Q: ' And when you say that, you mean Matt—Matt Keyes' labor?

A:  Yes. Yeah, right.

Q:   So you—you think he might have padded the bill, so to speak, on his labor?

A:   Yes.

¶ 16.   The circuit court bound the Keyes over for trial. It based its decision on Jones's testimony that the Keyes retained over $36,000 to pay themselves while there were unpaid claims of $47,000 due to other subcontractors. Thus, it determined that the unpaid subcontractors should have been proportionally compensated under Wis. Stat. § 779.02(5).

> [F]or the purpose of the preliminary hearing I consider the defendants retained slightly more than $36,000 for the purpose of paying themselves, I infer, while other subcontractors remain unpaid in the approximate amount of $47,000. That there were unpaid subcontractors due approximately $47,000 supports the inference deficiencies existed in the draws. The unpaid subcontractors should have been at least proportionally compensated.

¶ 17.   The Keyes moved to dismiss the bindover and the information, alleging that there was insufficient evidence to support the bindover. The circuit court denied the motion, and the Keyes appealed. The court of appeals affirmed the decision of the circuit court, and the Keyes petitioned for review.

II

¶ 18.   This case requires that we interpret Wisconsin's theft by contractor statute, Wis. Stat. § 779.02(5), and apply that interpretation to the facts of this case. Statutory interpretation and application present questions of law that we review independently of

the determinations rendered by the circuit court and court of appeals. *State v. House,* 2007 WI 79, ¶ 11, 302 Wis. 2d 1, 734 N.W.2d 140.

■

¶ 19. In addition, this case involves a question of whether there was sufficient evidence presented at the preliminary hearing to support the bindover. In determining whether evidence is sufficient to support a bindover, we employ a limited review. The reviewing court examines the evidence to the extent necessary to determine "whether there was any substantial ground for the exercise of judgment by the committing magistrate." *State v. Berby,* 81 Wis. 2d 677, 684, 260 N.W.2d 798 (1978). Once the reviewing court has discerned sufficient evidence to support the circuit court's determination of probable cause, the inquiry stops, and the court cannot proceed to weigh the evidence. *Id.*

## III

¶ 20. We address first whether the circuit court erred in finding probable cause that the Keyes committed a felony. In resolving this question we examine the words of § 779.02(5) and its purpose.

¶ 21. The Keyes were charged with theft by contractor under Wis. Stat. § 779.02(5), part of Wisconsin's construction lien law. Section 779.02(5) safeguards against misappropriation of construction project funds by creating trust funds for the benefit of owners, subcontractors, and suppliers. The trust fund is to pay claims due or to become due for labor and materials[3] used for the improvements:

---

[3] Wisconsin Stat. § 779.02(5) was modified by 2005 Wis. Act 204. It now provides that the trust fund is for claims due or to

> Theft by contractors. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor and materials used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person.

The statute prohibits the use of the money in the trust fund for any purpose other than paying claims until such time as the claims have been paid in full. In case of deficiency, the claims are to be paid proportionately. Violation of the payment provisions constitutes theft by contractor:

> The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. . . .

Wis. Stat. § 779.02(5).

¶ 22.  In examining the words of the statute, it is worth noting that the words "profit" and "priority" do not appear. As discussed more fully below, the court of appeals and at times the parties spend much of their discussion addressing "profits" and priority of payment.

---

become due or owing "for labor, services, materials, plans, and specifications used for the improvements." The change does not affect our analysis.

Such a discussion overlooks the basis of the circuit court's determination of probable cause: the claims were not paid proportionately. Tracking the statutory language, the focus of our inquiry is on whether payments received by Angela were used "for any other purpose" before "all claims . . . [had] been paid in full or proportionally in cases of a deficiency."

¶ 23. The Keyes assert that Angela was acting as a subcontractor, and that the payments Angela received (i.e., the entire $75,241.12) did not include "profit." Rather, they maintain the $75,241.12 paid to Angela was for the materials she provided at a price agreed to by the parties, and therefore it is simply a payment for a claim due within the meaning of the statute. They argue that so long as the money goes toward the project, payments do not violate the statute.

¶ 24. Like the court of appeals, we will assume without deciding that Angela was acting as a subcontractor on the project.[4] Even accepting the Keyes'

[4] The parties dispute whether Angela was a self-performing contractor or a subcontractor on the project. The circuit court and the court of appeals did not make a determination in this regard, and simply assumed for the sake of discussion that Angela was a subcontractor. The Keyes' claim that Angela was a subcontractor appears to conflict with this court's longstanding interpretation of "subcontractor" within the context of construction lien law. *See Marks Bros. Co. v. Goossen*, 197 Wis. 562, 568, 222 N.W. 818 (1929)(defining "subcontractor" within the meaning of construction lien law as "a person whose relation to the principal contractor is substantially the same as to a part of the work as the latter's relation is to the proprietor. . . . "); *see also* Steven W. Martin, *Wisconsin Construction Lien Law Handbook,* (3d ed. 2007) § 1.7 ("Generally, a party offering labor or materials for an improvement project is a subcontractor if that party is not dealing directly with the owner . . . ."). However,

assertion that the entire $75,241.12 is money to which they are entitled by virtue of their agreements with the Wettsteins, their action conflicts with the language of the statute. Section 779.02(5) requires that using trust fund money "for any other purpose until all claims . . . have been paid in full or *proportionally in cases of a deficiency,* is theft by the prime contractor . . . ." Wis. Stat. § 779.02(5) (emphasis added).

¶ 25.   The uncontroverted evidence in this case is that Angela received payments of $75,241.12, and the Keyes maintain that the payments were for Angela providing materials. In their brief, the Keyes maintain that the cost of those materials in the proposed-budget (including increases effected through change orders) was $72,792.[5] Thus, Angela was fully compensated.

¶ 26.   In contrast, Jones testified that there were subcontractors who had claims due, totaling more than $47,000. After the final draw from the construction account in November, there was not enough money to

whether Angela was a subcontractor or self-performing prime contractor does not bear upon our analysis.

[5] The Keyes' argument turns on the claim that they provided the Wettsteins with materials (including carpeting, tile, cabinetry, and countertops) at the price agreed upon by the parties. It is unclear from the record, however, what the Keyes contend is the agreed upon price. They state in their brief that the proposed budget for the materials supplied by Angela was originally $68,855, and was increased by subsequent change orders to $72,792. They also direct our attention to proposals for providing the materials (which are not signed by the Wettsteins) totaling $69,594. They do not explain how the $75,241.12 figure constitutes the agreed upon price, except that it is the total of invoices Angela submitted for her work. We note, however, that Jones's testimony was that the invoices appeared tailored to match the amount of money left in the draw.

pay the claims due the third-party subcontractors and also pay Angela the full $75,241.12 for materials. Accordingly, this was a case of deficiency, and the unpaid subcontractors were not compensated proportionally to Angela. As the circuit court stated in its written decision, "[t]he unpaid subcontractors should have been at least proportionally compensated."

¶ 27.   Moreover, the Keyes ignore the proportionality requirement when they claim that so long as money goes toward the project, payments do not violate the statute. While the Keyes are correct that money cannot be used for purposes outside of the project, that does not end contractors' responsibilities under the statute. Using the money to pay themselves in full while other subcontractors have not been paid proportionally constitutes using money for a non-statutory purpose.

¶ 28.   The Keyes' actions therefore conflict with the language of § 779.02(5). Assuming that Angela had a claim to the payments she received, taking full payment when third-party subcontractors remained unpaid violates the proportionality requirement of the statute.

■

¶ 29.   Our view is further supported by the purposes of the statute. This court has determined that § 779.02(5) creates a trust, and payments made to a prime contractor are not actually owned by the prime contractor. *Burmeister Woodwork Co., Inc. v. Friedel,* 65 Wis. 2d 293, 302, 222 N.W.2d 647 (1974). Rather, "the funds upon which the statute imposes the trust were received by the contractor for a particular purpose, the construction of improvements upon property." *Id.* The statutory purposes of the law are "(a) to protect the owner from having to pay twice and (b) to secure payments to subcontractors and workers." *Wisconsin Dairies Coop. v. Citizens Bank & Trust,* 160 Wis. 2d 758,

765, 467 N.W.2d 124 (1991). The statute serves to insure that the funds are used for those purposes. *Burmeister,* 65 Wis. 2d at 302.

¶ 30.   In *Kraemer Bros., Inc. v. Pulaski State Bank,* this court determined that the policy underwriting the statute is "to assist subcontractors and their subcontractors and suppliers in getting paid and to protect owners and prime contractors from paying twice." 138 Wis. 2d 395, 402–03, 406 N.W.2d 379 (1987). It therefore concluded that money in a subcontractor's hands was held in trust for the benefit of second-tier or sub-subcontractors, even though the money was not paid directly to the subcontractor by the owner. *Id.* at 403.

¶ 31.   The Keyes maintain that the statutory purpose of protecting owners from paying twice for work supports their interpretation of the statute. That is, so long as trust fund money stays in the project and is used for payments that owners would owe, then it is not "used for any other purpose" under § 779.02(5).

¶ 32.   This is also the interpretation proffered by amicus Association Contractors. They argue that the proper interpretation of the statute is that it prohibits contractors from diverting money away from a project rather than prohibiting payment for a contract that includes profit within a particular project. They cite a litany of cases in which § 779.02(5) has been applied to prohibit paying non-project expenses from trust fund moneys. *See, e.g. Capen Wholesale, Inc. v. Probst,* 180 Wis. 2d 354, 509 N.W.2d 120 (Ct. App. 1993) (money used to pay general corporate expenses); *State v. Sobokowiak,* 173 Wis. 2d 327, 496 N.W.2d 620 (Ct. App. 1992) (money from one project used to pay car payments and expenses from other projects); *Burmeister Woodwork,* 65 Wis. 2d 293 (money used for general

business expenses); *Pauly v. Keebler,* 175 Wis. 428, 185 N.W. 554 (1921) (money used to pay contractor's living expenses).

¶ 33.  Their interpretation, however, ignores the second statutory purpose, securing payments for subcontractors. Allowing a prime contractor acting as a subcontractor to pay itself in full while leaving subcontractors with unpaid claims totaling $47,000 is incompatible with the purpose of "secur[ing] payments to subcontractors and workers." *Wisconsin Dairies,* 160 Wis. 2d at 765. Assisting subcontractors and workers in getting paid at least demands that, in cases of deficiency, subcontractors be paid proportionally.

¶ 34.  In sum, we determine that under the language of the statute, the Keyes are required to pay trust fund money proportionally to subcontractors in cases of deficiency. Here, the uncontroverted evidence is that Angela was paid while $47,000 in claims from subcontractors remained unpaid. Such payments would constitute use of trust fund money for "any other purpose [before] all claims . . . have been paid in full or proportionally in cases of a deficiency." Our interpretation is further supported by the statutory purpose of § 779.02(5), which is to both protect owners from paying twice and secure payments for subcontractors and workers. Accordingly, we determine that the circuit court's finding of probable cause was based on a proper interpretation of the statute.

IV

¶ 35.  Although the circuit court's conclusion that there was probable cause to believe that the Keyes had committed a felony was based upon its determination that the subcontractors should have been paid propor-

tionally, the court of appeals jettisoned the inquiry. Instead of focusing on proportionality, it focused on profit.

¶ 36. In their original brief to the court of appeals, the Keyes indicated that the unaccounted for $36,036.28 was really profit on materials, to which they were entitled. The court of appeals then, sua sponte, asked for supplemental briefs on the question of whether § 779.02(5) prohibits a prime contractor acting as subcontractor from paying itself for profit on materials supplied as a subcontractor.

¶ 37. In proposing this question the court of appeals took an argument of the parties and transformed it into an "undisputed fact" upon which it relied as a basis of its analysis. Indeed, the penultimate paragraph of the majority opinion begins: "In sum, the record and the Keyeses' own concessions that the $36,036.28 was kept as a profit . . . ." *State v. Keyes,* 2007 WI App 163, ¶ 36, 304 Wis. 2d 372, 736 N.W.2d 904.

¶ 38. The circuit court, however, made no such determination. It is not clear from the record whether the money was taken as profit, was diverted by the Keyes through bogus invoices and recycling of funds as Jones testified, or was something else altogether. After acknowledging the argument of the Keyes, the circuit court concluded that there was probable cause to believe that the use of the funds "was criminal in nature rather than innocent in nature." Ultimately, without making a factual determination regarding the $36,036.28, the circuit court was going to let the finder of fact decide: "The finder of fact in these matters may very well conclude the defendants were entitled to retain all of the monies they kept."

¶ 39.   Even if it turns out that the money was profit, that alone is neither here nor there. Rather, the issue is whether payment was proportional as required by § 779.02(5).

¶ 40.   Nevertheless, based on the parties' briefs, and relying on *Sobokowiak,* 173 Wis. 2d 327, the court of appeals determined that § 779.02(5) prohibits prime contractors acting as subcontractors from receiving profit prior to paying other subcontractors for their labor and materials:

> [Section] 779.02(5) precludes a prime contractor who also acts as a subcontractor from paying itself a profit before all other subcontractors have been paid in full for amounts due or to become due and owing for their labor and materials, or paid proportionately where there is a deficiency.

*Keyes,* 304 Wis. 2d 372, ¶ 16. The Keyes may be criminally liable under § 779.02(5), the court asserted, insofar as "they intentionally used money from the entrusted funds to pay themselves a profit . . . ." *Id.,* ¶ 22.

¶ 41.   For several reasons, we decline to follow the court of appeals' approach here. As noted above, it bases its analysis on a faulty assumption, i.e., that it is undisputed that the Keyes kept the unaccounted for $36,036.28 as profit. *Id.*

¶ 42.   In addition, it is unclear how to construe "profit." The State does not contend that the Keyes violated the statute for receiving some or all of their contractor fee prior to the end of the project. However, a leading treatise on construction law understands contractor fees to include profit; "[t]he contractor's fee covers non-reimbursable costs which will be expended and the profit on the work." 2 Steven G.M. Stein,

535

*Construction Law,* § 7.01[5][a] (2007). The court of appeals' view would potentially preclude taking that fee.[6]

¶ 43. Further, the court of appeals' approach appears to require that any profit be deferred until the end of a project.[7] Its statement that primary contractors must "pay all subcontractors for their labor and

---

[6] Association Contractors (Associated General Contractors of Wisconsin, Inc., Associated General Contractors of Greater Milwaukee, Inc., and Associated Builders and Contractors of Wisconsin, Inc.) filed an amicus brief. They assert that there are a wide variety of construction contracts as well as many contingencies that can affect profits within a construction project. They note that in addition to the "fixed price/lump sum" contracts like the one in this case, there are other construction contracts, such as "time and material," "cost of work plus profit," "guaranteed maximum price with or without shared savings," and "design build." They also advance that projects may appear profitable at one moment but become unprofitable later due to unforeseen problems.

Thus, Association Contractors object to the court of appeals' focus on profits and complains that its treatment is ill-defined and unduly burdensome. Because we base our analysis on the language of the statute in requiring proportionality, we need not further analyze here the concept of profits in the construction arena.

[7] Association Contractors contend that the court of appeals decision may be read to preclude a primary contractor's first-tier subcontractors (i.e., those who contract directly with the primary contractor) from receiving full payment because profit is incorporated into the price negotiated between the primary and the subcontractor. Although we disagree with that interpretation of the court of appeals decision, we agree that Wis. Stat. § 779.02(5) · does not preclude first-tier subcontractors from receiving full payment until the end of a project. Section 779.02(5) states that payments to subcontractors "constitute a trust fund only in the hands of the . . . subcontractor to the amount of all claims due or to become due or owing from the . . . subcontractor for labor, services, materials . . . ." The plain language of the section is that

materials in full, or proportionally in cases of a deficiency, before paying themselves a profit," *Keyes,* 304 Wis. 2d 372, ¶ 23, is open-ended and could be interpreted to require foregoing profit even before a bill is due or to become due.

¶ 44. The court of appeals' approach also does not follow from *Sobokowiak.* The defendant, Sobokowiak, entered into a contract to build a home, and the owners placed money from a construction loan into an account. On Sobokowiak's request for a draw on the account, the bank issued a cashier's check and Sobokowiak deposited the money in his company's checking account. 173 Wis. 2d at 331. As of December 22, 1989, Sobokowiak had disbursed the entire amount of the draw, had little money in the account, and yet owed a lumber supplier over $30,000. *Id.* at 332. During that period, he used over $18,000 from his account for labor and materials on other jobs, a car lease payment, and a telephone bill. *Id.* at 335.

¶ 45. Sobokowiak sought to introduce evidence that the lumber supplier had waived its claim to money from the account and had accepted a credit arrangement instead. *Id.* at 332. The court of appeals, however, determined that it was irrelevant whether he had fulfilled the obligation at some point in time. Rather, what mattered was whether the money had been used for other purposes prior to the claims being satisfied. *Id.* at 334. It quoted *Burmeister* for the proposition that under § 779.02(5), funds "can only be used for the payment of claims of the beneficiaries *until all such*

such payments are held in trust for claims due or to become due or owing from the subcontractor, that is, payments to the sub-subcontractors or second-tier subcontractors. This view is made clear in *Kraemer Bros., Inc. v. Pulaski State Bank,* 138 Wis. 2d 395, 403, 406 N.W.2d 379 (1987).

537

*claims are paid." Id.* (quoting *Burmeister,* 65 Wis. 2d at 299)(emphasis in *Sobokowiak*). Thus, *Sobokowiak* does not prevent profit outright in the way implied by the court of appeals.

¶ 46. It is not clear whether the unaccounted for $36,036.28 was merely profit. Further, the court of appeals' approach fails to explain how to construe "profit," implies that contractors or subcontractors may not receive profit on a project until the project ends, and is not required under *Sobokowiak.* We therefore disagree with the court of appeals that § 779.02(5) prohibits prime contractors acting as subcontractors from receiving profit prior to paying other subcontractors for their labor and materials.

## V

¶ 47. We turn next to the question of whether there was sufficient evidence presented at the preliminary hearing to support the bindover. Under Wis. Stat. § 970.03(7), a court shall bind a defendant over for trial if after the preliminary hearing the "the court finds probable cause to believe that a felony has been committed by the defendant." As we stated in section II, our review is limited to whether there exists "any substantial ground for the exercise of judgment by the committing magistrate." *Berby,* 81 Wis. 2d at 684.

¶ 48. The Keyes' primary argument that the evidence does not support the bindover is their legal argument that § 779.02(5) was not violated because Angela was a subcontractor and the payments to her were for claims due. For the reasons explained in the previous sections, we are not persuaded by that contention.

¶ 49. In addition, the Keyes contend that the State failed to present sufficient evidence that there

were claims due or to become due or owing when Angela received payments. They argue that Jones's testimony does not specify when third-party subcontractor claims became due. Because work on the project continued after the Keyes left the project, and Jones's investigation took place after they left the project, the Keyes maintain that the work giving rise to the claim could have been performed after Angela had received payment.

¶ 50.   Although the Keyes are correct that Jones's testimony did not specify a time when the $47,000 in subcontractors' claims became due, her investigation began shortly after the Keyes left the Wettstein job. Jones testified regarding the $36,036.28 in unaccounted for payments received by Angela. Such evidence is a substantial ground for the circuit court's determination. The fact that Jones's testimony did not specify a precise time at which the $47,000 in unpaid claims became due goes to the weight of the evidence. However, our review of a bindover does not extend to weighing the evidence. *Berby,* 81 Wis. 2d at 684.

¶ 51.   Moreover, Jones's testimony was not limited to the existence of $47,000 in unpaid claims and $36,036.28 in unaccounted for payments to Angela. She testified regarding the Keyes' irregular practices regarding invoices, which she considered "bogus." These irregular practices included the apparent tailoring of invoices to match cashier checks for the exact funds remaining in their account. It also included "recycling money or generating invoices to match a cashier check so she could say that she was entitled to this money."

¶ 52.   At the preliminary hearing Jones testified that the payments to Angela had not been supported by adequate documentation. Additionally, she testified

that she was dubious that the Keyes were entitled to all of the money they claimed as payment for Matthew Keyes' labor.

¶ 53. The testimony provided by Jones is substantial, and it is sufficient to support the circuit court's determination that subcontractors should have received proportionate payment. The evidence presented therefore provides a substantial ground for the circuit court's exercise of judgment in determining that a felony had been committed by the Keyes. We therefore decline to upset the circuit court's decision to bind over the defendants.

## VI

¶ 54. In sum, based upon the language of § 779.02(5) and its purpose, we agree with the court of appeals that the circuit court's finding of probable cause was based on a proper interpretation of the statute. However, we disagree with the court of appeals to the extent that its decision implies that contractors or subcontractors may not receive profit on a project until the project ends. We further conclude that the State presented sufficient evidence at the preliminary hearing to support the bindover. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.